[No. 32014.   Department Two.   June 24, 1953.]

THE STATE OF WASHINGTON, *Respondent,* v. LOUIS GELLERMAN, *Appellant.*[1]

[1]Reported in 259 P. (2d) 371.

*J. Edmund Quigley,* for appellant.

*Charles O. Carroll* and *John L. Vogel,* for respondent.

DONWORTH, J.—Defendant was charged by information with committing the following crimes: In counts I and II he was charged with sodomy, in count III with attempted sodomy and in count IV with lewdness. Count II was dismissed from the case during the course of the trial, and the jury returned a verdict of guilty on counts I, III, and IV.

Motions in arrest of judgment and for a new trial were made and denied. From the judgment and sentence pronounced upon the verdict, defendant has appealed.

On this appeal, appellant is represented by counsel who did not participate in the trial of the case.

The trial began December 3, 1951, and consumed eight days. The statement of facts comprises more than eleven hundred pages. Appellant does not contend that the evidence was not sufficient to support the verdict. His assignments of error are based upon the contention that because of certain alleged errors he was prevented from having a fair trial. No useful purpose would be served by summarizing the testimony, and we shall refer only to such portions thereof as are necessary to an understanding of appellant's five assignments of error, which are stated in his brief as follows:

"I

"The trial court erred in denying appellant's motion for a mistrial on the basis of the Opening Statement of the Prosecuting Attorney to the jury wherein the character of the appellant was attacked and put in issue; and the jury was informed that there had been other criminal charges filed and pending against the appellant; and that he had been a fugitive from justice on one of these charges.,

"II

"The trial court erred in allowing the State of Washington, over objection, to present evidence in its case in chief that a deputy sheriff of King County had been searching for the defendant to serve a warrant upon him in which he was allegedly charged with another crime in another court.

"III

"The trial court committed reversible error by refusing to instruct the jury that Count II had been dismissed out of the case at the time the dismissal occurred; and then representing to the jury by written instruction that the count had been withdrawn at the conclusion of the State's case; and further by including in the written instruction the complete charge as contained in Count II; and then instructing the jury that while they could not find the defendant guilty of the crime charged in the count, they should consider all of the evidence admitted with reference to such count to show scheme, plan and desire.

"IV

"The trial court erred in failing to instruct the jury to disregard certain evidence of a State's witness, after having informed the jury that such a written instruction would be given.

"V

"The trial court committed reversible error by displaying an attitude of increasing disdain towards the appellant and his counsel, culminating in prejudicial and embarrassing reprimands before the jury."

The evidence showed the following circumstances which led to appellant's being questioned by a police detective and to his subsequently being charged with vagrancy:

In August, 1950, a physician informed the prosecuting attorney of King county that one of his women patients (who will be referred to as "Vera") had complained to him of certain immoral conduct by appellant. The physician had previously suggested to Vera that she go to appellant for psychological treatments. Appellant held a Ph.D. degree in psychology from Clark University and was then engaged in practice as a consulting psychologist.

On August 12, 1950, the prosecutor and one of his investigators went to Vera's home. While they were questioning her, appellant arrived, inquired as to the nature of their visit, and stated that he thought their presence was not conducive to her welfare. Appellant left when he saw that the others intended to stay until their business was completed.

Later, on the same day, the prosecutor telephoned appellant at his home and asked him to return to Vera's residence. He did so and was advised of the accusations made against him by her. Appellant was then taken to police headquarters for questioning and was allowed to call his attorney, who arrived about an hour and a half later.

The prosecutor, a police detective, appellant, and his attorney conversed for some time. It was agreed between them that, if appellant would make a complete statement concerning his conduct with Vera, the state would file a sexual psychopath proceeding rather than a criminal charge of sodomy.

Appellant was a candidate for the office of state senator on one ticket, and the prosecutor was running for re-election to his office on another ticket. Appellant claimed that the accusations against him were based on political considerations. In order to obviate any such implication, it was further agreed that appellant would consult a psychiatrist of his own choosing, and that no sexual psychopath proceeding would be instituted until after the general election in November. Appellant testified that his understanding was that, if he agreed to the above stated terms, no criminal charge would ever be filed and the whole matter would be kept confidential.

In his attorney's presence, appellant made a voluntary statement of his conduct with Vera which was recorded on a wire recording device, and appellant was then released. The material portions thereof were reduced to writing and a few days later were signed by appellant.

On November 15, 1950, pursuant to his agreement, the prosecuting attorney filed a vagrancy charge in the justice court as a basis for the sexual psychopath proceeding. This charge was based on the statement appellant had made in August, 1950, concerning his relations with Vera.

When appellant did not voluntarily surrender, a warrant for his arrest was issued, but he could not be found within the state. At the trial, he testified that he left the state on the day the vagrancy charge was filed and did not return until March, 1951. On April 18, 1951, he surrendered to the authorities.

Believing himself no longer bound by the agreement because of appellant's flight, the prosecuting attorney on April 23, 1951, filed the information in this case.

Count II was based upon the same incident as the vagrancy charge filed in November, 1950, and later abandoned. The other three counts were based upon complaints concerning appellant's conduct received from other women patients after the vagrancy charge had been made public.

Turning to a consideration of appellant's first assignment of error, appellant contends that the trial court erred in denying a motion for mistrial based on the state's opening

statement. He complains that the jury was informed by the deputy prosecutor that he had previously been charged with an unnamed offense in the justice court and a warrant for his arrest issued based on this prior offense. Appellant charges that, by his opening statement, the deputy prosecutor deliberately set out to destroy any possibility of his having a fair trial.

Parenthetically, it may be stated that no motion for a mistrial on the ground of misconduct of the deputy prosecutor in his opening statement was made until approximately twenty-four hours after the event which is now claimed to have been prejudicial. The ground stated by appellant's then counsel was:

"MR. LEWIS:    .  .  . Second, I would like to move that there be a mistrial on the opening statement of the prosecution. THE COURT: What is the basis of the motion? MR. LEWIS: They brought in the commission of other offenses, they brought in the character of the defendant before the defendant even brought in his character. THE COURT: The motion for mistrial will be denied."

The opening statement began by describing to the jury the evidence which the state intended to present to prove the allegations of the four counts contained in the information. Next, the deputy prosecutor described how appellant had been taken to police headquarters to give his statement concerning his conduct with Vera. He then continued:

"Further, we will show you that that statement was taken from him for a given purpose. That is, the State at that time in order to prevent bringing witnesses here and requiring them to testify as to these details, told the defendant Gellerman and his lawyer that if he would tell everything in his own language concerning this *one incident,* that the State of Washington would proceed against him under the sexual psychopathic law, and Gellerman was worried about—it was perfectly agreeable with him, but he was worried about the elections. Mind you, this was in August. I think he was running for some kind of an office, a state office, and he didn't want anything to be done until after November the 7th and complained of political pressure, that it was all just a political scheme-up, and so it was agreed at that time, in order to eliminate entirely from the consideration of any

jury or any judge which might ever be called upon to hear these facts and decide the issues, that Gellerman would go on his way but that he would—it would not be made public until after the election in order to completely eliminate any defense which he might have of political pressure upon him, but immediately after November the 7th, I believe it was on November the 15th to be exact, *upon the statement which the defendant Gellerman himself had given* the State of Washington filed what is known as sexual psychopathic proceedings against Gellerman alleging him to be a sexual psychopath, to which proceeding Gellerman had agreed, but he couldn't be found. From November the 15th, beginning on November the 15th when a warrant was filed, a charge was filed in the Justice Court, a warrant obtained, and at the same time an order for apprehension obtained out of Superior Court for him, sheriff's deputies went out, no Gellerman any place could be found. Numerous calls were made by the sheriff, deputy sheriffs, in an attempt to locate this man. They talked with his family, everybody who might know him, and he just wasn't to be found. He didn't in fact show up until I think it was April the 18th of 1951, a period of some five months after these proceedings had originally been filed. Consequently the State of Washington, feeling itself no longer bound by the agreement, went ahead and filed the felony charges against this defendant." (Italics ours.)

To support his argument that the deputy prosecutor's opening statement was highly prejudicial and that a mistrial should have been granted, appellant relies on *State v. O'Donnell*, 191 Wash. 511, 71 P. (2d) 571.

In that case, the defendants were on trial for murder. In his opening statement to the jury the prosecutor said: .

" 'Incidentally, the evidence will show both of these men have records for burglary and robbery—prior records, and they have both served time in penitentiaries. . . . in view of the other testimony, in view of the other burglaries and the records that will show from the evidence, the state is going to ask you to hang these two men.' "

This court, in a five to four decision, reversed the conviction and held that the prosecutor's statement was ground for a mistrial even in the absence of a motion for mistrial or a request to inform the jury that the remarks were to be

disregarded. This holding was based on the reasoning that the opening statement placed defendants' characters in issue in advance of their taking the stand in their own .defense, that the jury was asked to hang the defendants on the basis of their prior convictions, and that they were forced to take the stand or rest under the imputation of those crimes.

██ In the case at bar, an entirely different situation is presented. No prior collateral crimes were referred to in the opening statement. The vagrancy charge and the warrant for·arrest were based on the same acts of appellant as were involved in count II of the information. This was apparent from the above quoted portion of the opening statement. Under the sexual psychopath law in force in 1950 (Laws of 1949, chapter 198, § 26, p. 614, Rem. Supp. 1949, § 6953-26), it was necessary to file a criminal charge in either the justice court or the superior court preliminary to petitioning the superior court to have defendant brought in for a hearing to determine whether or not he was a sexual psychopath. The deputy prosecutor had the right to explain this procedure to the jury as well as to apprise them of the history of the charge for which appellant was being tried.

██ Appellant next claims that it was error for the court to permit the state to introduce evidence tending to prove that, after the vagrancy charge was filed, appellant could not be found, that a warrant was issued for his arrest, and a deputy sheriff sent to search for him.

The rule is that evidence is admissible tending to show that, after the commission of a crime, the accused fled and concealed himself as if to elude justice or endeavor to avoid arrest. It is a material circumstance to be considered by the jury in connection with all the other facts and circumstances in arriving at its verdict. *State v. Lew,* 26 Wn. (2d) 394, 174 P. (2d) 291; *State v. Wilson,* 26 Wn. (2d) 468, 174 P. (2d) 553; *State v. Moser,* 37 Wn. (2d) 911, 226 P. (2d) 867. The *rationale* of these cases is that flight is an instinctive or impulsive reaction arising·from a consciousness of guilt or is a deliberate attempt to avoid arrest or prosecution.

Since for the reasons mentioned above it was proper to admit evidence of flight at the trial, it was proper for the

deputy prosecutor to refer to appellant's flight in his opening statement.

Appellant's third assignment of error must of necessity be broken into four parts. He contends that the trial court committed reversible error by: (1) refusing to instruct the jury that count II of the information had been dismissed from the case when the dismissal occurred; (2) representing in instruction No. 2 that count II was not dismissed until the state rested its case; (3) including in that instruction the complete charge as contained in count II; (4) instructing the jury that all evidence relating to count II could be used to show plan, scheme, *desire* or intent to commit the acts alleged in counts I, III or IV.

We do not deem it necessary to separately discuss parts (1) and (2) of the third assignment, since a consideration of the facts essential to a proper understanding of parts (3) and (4) thereof will indicate that count II of the information was not actually dismissed from the case until just before the state rested. When the state's case had progressed to the point where the evidence tended to show appellant's flight (after the filing of the vagrancy charge as explained above), the deputy prosecutor, instead of calling Vera as the prosecuting witness in support of count II, called the police detective who had taken appellant's statement on the wire recorder. Appellant's then counsel requested that the jury be excused and, in the absence of the jury, objected to the introduction of appellant's recorded statement until such time as the *corpus delicti* under count II had been established. The deputy prosecutor replied that he was not following the usual order of procedure because, in light of certain medical information which he had received, he would have to petition the court to move the proceedings to Vera's home in order to take her testimony.

Still in the absence of the jury, Dr. Riley, a psychiatrist who had examined Vera, stated that in his opinion she would be absolutely incapable as a witness if brought to court to testify. The trial court took the state's motion under advisement. The deputy prosecutor contended that, even if the motion was denied, the evidence of appellant's

statement could be used to show "motive, intent and so forth" to commit the crimes charged in the other counts of the information. After the wire recording of appellant's statement was played to the jury, Dr. Riley was again called to testify concerning Vera's condition. At the conclusion of his testimony, the court denied the motion to adjourn the trial to her home and dismissed count II from the case. The state immediately rested.

At the end of the entire case, the court gave the instructions complained of in parts (3) and (4) of the third assignment of error. Instruction No. 2 restated the allegations contained in count II of the information and then continued:

"During the first portion of the trial, Count II remained in the information, and some evidence was admitted relating thereto. At the conclusion of the State's case, the Court withdrew Count II from the consideration of the jury. None of the evidence relating to Count II, whether received before or after the Court's ruling just mentioned, has been withdrawn from the jury's consideration.

"Count II was withdrawn from the jury only because of the provision of the law of the State of Washington that, under circumstances like those of this case, a person may not be convicted of the crime charged unless some witness, other than the defendant, testifies that the crime was actually committed. In withdrawing Count II from the jury, the Court did not pass upon the truth or falsity, weight or credibility of any of the evidence admitted relative to Count II.

"The sole effect of this ruling is that you cannot convict the defendant of the crime charged in Count II.

"The evidence relative to acts and conduct of defendant with Vera . . . , however, is submitted to you for your consideration with reference to the offenses charged in Counts I, III and IV. The rules by which you are to be governed in so considering it are set forth in Instruction No. 13."

Instruction No. 13 read:

"The Court has admitted evidence relating to offenses other than the specific crimes charged in Counts I, III and IV of the information. This evidence is submitted for your consideration in accordance with the following principles and rules:

"In any case, when one party alleges that a certain act was committed and the other party denies it, the first party may show that at the time in question the alleged doer of the act had a plan, scheme, *desire* or intent to commit the act, as a circumstance tending to prove that he in fact committed it; and the first party may likewise offer evidence of similar acts committed on other occasions by the alleged doer in order to show that he had such plan, scheme, *desire* or intent at the time in question. The jury is the sole judge of the weight to be given such evidence.

"Such evidence is not to be used for any other purpose than as above stated. Specifically, you are instructed that, even if you should be satisfied that defendant on another occasion committed some offense similar to those charged in the information, such finding alone would not be sufficient to warrant a conviction in this case. The defendant is not on trial for any offense except those alleged in Counts I, III and IV of the information. Before you can find the defendant guilty on any count in the information, you must be satisfied beyond a reasonable doubt of the truth of the charge contained in that count." (Italics ours.)

■ Generally, when one is on trial charged with specific offenses, evidence of the commission of other collateral crimes is inadmissible. The rule, however, has certain well defined and well recognized exceptions, as where the element of motive, identity, intent, absence of accident or mistake, a common scheme, plan, or design is involved. In such instances, evidence of similar transactions may, in proper cases, be received to establish a constituent element of the crime charged even though it may at the same time tend to prove the commission of other criminal offenses. *State v. Salle,* 34 Wn. (2d) 183, 208 P. (2d) 872, and cases cited; *State v. Goebel,* 36 Wn. (2d) 367, 218 P. (2d) 300, and 40 Wn. (2d) 18, 240 P. (2d) 251.

■ The record discloses that the wire recording of appellant's statement to the police detective was offered by the state and admitted by the trial court only to show a scheme, plan, design, or intent by appellant to commit the type of offenses charged in counts I, III, and IV. This evidence of appellant's admissions concerning his conduct with Vera did tend to show a plan, scheme, or design on his part to win

the confidence of his women patients and then convince them that the quickest way for them to get well was to conduct themselves exactly as he suggested. This was referred to by appellant as the "jarring technique."

■ Unfortunately, through a typographical error, the word "desire" was substituted for the word "design," with the result that instruction No. 13 informed the jury that they could consider this evidence to show that appellant had a plan, scheme, or "desire" to commit the offenses charged in counts I, III, and IV. This word was used twice in that instruction and was again quoted to the jury by the deputy prosecutor in his closing argument. The effect of this inadvertent error was to inject the matter of a defendant's desire into a case involving sexual misconduct by instructing the jury in effect that, if it found that the defendant had *a desire* to commit one such offense, it might consider that fact in determining the question of his guilt as to similar offenses charged in the remaining counts. This is obviously an incorrect statement of the law.

We think that the trial court did not intend to so instruct the jury. However, the matter was called to the court's attention by appellant's then counsel in excepting to instruction No. 13 as follows:

"As to the Court's Instruction No. 13, we object on the ground that the instruction is erroneous in that it should be—if there is any proof of plan, scheme or intent, *and I see the word 'desire' in the instruction, I don't believe it properly belongs there,* but if there is any question of plan, scheme or intent it should be confined to the same person that complains of the charge contained in the counts of the information. In other words, in my own language, acts with other third persons do not tend to prove relationship and the basis for a plan, scheme or intent with the accusing witness." (Italics ours.)

At this point, the deputy prosecutor could have requested the court to call the jury back and inform them that, through inadvertence, instruction No. 13 contained a misspelled word. Doubtless the court would have complied with such request and reread the instruction to the jury, substituting "design" for "desire." Thus the error could have been

readily cured, but nothing was done by the state or by the court to correct it.

Since instruction No. 13 contained the error above noted, it becomes our duty to determine whether the giving of the instruction was prejudicial to the rights of appellant. *State v. Britton,* 27 Wn. (2d) 336, 178 P. (2d) 341; *State v. Clayton,* 32 Wn. (2d) 571, 202 P. (2d) 922. When there has been a substantial misdirection to the jury upon a material question of law bearing upon the issues of fact before it, prejudice will be presumed unless it clearly appears from the whole case that there could be no prejudice. *Nordeen Iron Works v. Rucker,* 83 Wash. 126, 145 Pac. 219; *Franks v. Department of Labor & Industries,* 35 Wn. (2d) 763, 215 P. (2d) 416. Where an erroneous instruction has been given, it must be presumed on appeal that the jury followed the instruction as given unless the contrary clearly appears. 3 Am. Jur. 511, Appeal and Error, § 949.

Instruction No. 13, except for the substitution of the word above noted, correctly apprised the jury of the applicable law. No attempt is made by the state in this court to demonstrate that the substitution of the word "desire" for the word "design" was not prejudicial to appellant. In fact, respondent's principal argument in support of instruction No. 13 is that appellant's exception thereto was not sufficiently specific to support his assignment of error. We think that the italicized portion of the above quoted exception was adequate to call the attention of the court and deputy prosecutor to the misspelling of the word intended to be used. The state's argument that the word "desire" was, at worst, merely surplusage is without merit for the reasons herein stated.

It, therefore, is presumed to be prejudicial error, since it could reasonably have influenced the judgment of the jury. *State v. Levy,* 8 Wn. (2d) 630, 647, 113 P. (2d) 306, 313. Because of the prejudicial effect of the use of the word "desire" in instruction No. 13, appellant must be granted a new trial.

Since the situation complained of in the fourth assign-

ment of error is not likely to recur on a new trial, it need not be discussed.

As to the fifth assignment of error, the record discloses that the court displayed admirable patience and fairness throughout the course of the trial. The reprimand of which complaint is made was merited by the conduct of appellant's trial counsel. The incident presumably will not recur, so we will not make further reference to it.

While it is regrettable that this case, the trial of which lasted eight days, must be retried because of a typographical error consisting of two letters, appellant is entitled to have a jury pass on the evidence of his misconduct after being correctly instructed as to the applicable law. Through this error (originally inadvertent but not corrected), appellant was deprived of a fair trial.

For the reasons stated above, we are compelled to reverse the judgment and remand the case for a new trial as to the three counts upon which appellant was convicted.

GRADY, C. J., SCHWELLENBACH, HAMLEY, and FINLEY, JJ., concur.

October 2, 1953. Petition for rehearing denied.