[No. 38045.    Department One.    July 13, 1967.]

THE STATE OF WASHINGTON, *Respondent,* v. MARVIN J. PICHE, *Appellant.**

*Reported in 430 P.2d 522.

*Francis Conklin,* for appellant.

*Paul A. Klasen, Jr.,* for respondent.

HALE, J.—The prosecuting attorney for Grant County charged Marvin J. Piche and J. L. Mullenix in three counts with robbery, grand larceny, and taking a motor vehicle without the permission of the owner—all arising from a robbery in the Highway Grocery near Ephrata, October 11, 1963. From a verdict and judgment and sentence of guilty entered April 29, 1964, on all three counts as to both defendants, Piche appeals. Thirty-eight witnesses presented by the state made out a prima facie case, and no claim is made that the evidence was insufficient to support the verdict. Neither defendant testified in his own behalf.

The state's evidence showed that a gunman entered the Highway Grocery October 11, 1963, walked to the rear, and ordered the owner at gunpoint to put all his cash in a paper sack. Obeying this order, the grocer put about $1,000 into the sack, and the robber, casually walking out of the store with the money, got into a waiting car. Two men drove away in the car. Since the record supports the verdict, we will consider the assignments of error without further recital of the details.

Defendant assigns error to the denial of a mistrial when the prosecuting attorney in his opening statement to the jury referred to defendant's escape from the Grant County jail while in custody awaiting trial. The prosecuting attorney said:

> James Fletcher, Jon Andrews and Ben Rogers will testify, most likely, relative to—the defendants, after they were held in custody here in Grant County Jail, made an attempt to escape.
> . . . .

Members of the jury, the state will produce evidence relative to the fact that sometime around the 15th of February both of the defendants escaped from the Grant County Jail while awaiting trial on this matter. They were apprehended over in Soap Lake in the presence of Chief of Police Ben Rogers and Jon Andrews, who is another deputy sheriff.

■■ Proof of escape from the custody or confinement in which one is held pending trial is admissible at the trial of the charge for which one is held awaiting trial. *State v. Thomas*, 63 Wn.2d 59, 385 P.2d 532 (1963); *Bird v. United States*, 187 U.S. 118, 47 L. Ed. 100, 23 Sup. Ct. 42 (1902). Only when the custody or confinement is so remote to the crime charged as to be irrelevant is escape from such confinement inadmissible.

Since the defendant was, at the time of his escape, being held for trial in the Grant County jail on the instant charge—although he may additionally have been detained on other charges, too—evidence of his escape became relevant and admissible. That defendant may, at the time of his escape, be in custody under various processes for other offenses does not render proof of the escape irrelevant where the defendant breaches the very custody maintained to assure his appearance at trial for the offense whereof he stands charged. Proof of the escape being admissible, reference to it was proper in the opening statement. Either party may, in the opening statement, refer to admissible evidence expected to be presented at the trial. *State v. Gellerman*, 42 Wn.2d 742, 259 P.2d 371 (1953).

Defendant assigns error to the admission of two written statements made by him following his arrest in California. One statement, signed November 26, 1963, in the office of the Sacramento County Sheriff, Sacramento, California, in the presence of A. E. Smeltzer, Grant County Deputy Sheriff, gave a detailed description of defendant's participation in the robbery and flight, and stated at the outset "that there have been no threats made against me or promises made to me in order to give this statement, and this is a free and voluntary act on my part."

The other statement, given to the sheriff of Grant County, Ralph Hall, and his deputy, A. E. Smeltzer, at the Chelan County Sheriff's office in Wenatchee, likewise set forth a detailed confession of defendant's participation in the robbery and of his flight and ultimate capture by the San Francisco police. It, too, contained a written acknowledgment that the statement was freely and voluntarily made, without threats or promises.

Defendant had been arrested in a Greyhound Bus Depot in San Francisco when he ran away at the sight of two policemen and crawled under a bus. On searching him, the officers discovered a locker key and some identification papers relating to a Peter Pallazzolo, which name defendant gave as his own. In the locker, the police found some stolen checks and a .38 revolver similar to that used in the Highway Grocery robbery.

Evidence showed that on the morning of the Highway Grocery robbery, a man had registered at the Wilbur Hotel in Wilbur—a town near Ephrata—under the name of Pallazzolo. This individual, taking a second floor front room in the hotel overlooking the main street, had departed the next day, leaving his bed undisturbed and apparently unoccupied. It developed that Mr. Pallazzolo, true owner of the identification papers, had lost his wallet and papers in Spokane shortly before the robbery, and, thus, the sheriff had good reason to regard defendant's possession of the Pallazzolo papers as a relevant clue to one of the participants in the robbery.

At a pretrial hearing to determine prima facie the voluntariness of the two confessions, Arnold E. Smeltzer, deputy sheriff of Grant County, testified that, before interviewing defendant Piche in jail in Sacramento, he identified himself and his office and told defendant he was investigating the Highway Grocery robbery. Piche made no statements at that interview and was questioned by Smeltzer once or twice more with no response. Smeltzer testified that Piche declined to make any statements until his extradition to Washington was complete, as he was being held on bur-

glary charges in California but preferred to return to Washington.

Smeltzer testified that, once extradition was assured, he informed Piche his statements could be used against him in evidence, and Piche then related the details of the crime. Smeltzer said that he typed the statement on a typewriter, a sentence or two at a time, as Piche recited the events of the robbery and flight, and at the conclusion defendant read it over, initialed some corrected errors and signed it. Both statements, as we have said, contain a declaration that they are made freely and voluntarily without threats or promises as an inducement.

Although he implies the contrary, defendant's evidence strongly indicates he knew of his right to remain silent. He testified, at the pretrial hearing, that a public defender had been appointed as counsel for him in California and that he had consulted with him before giving a statement there. He said that on a prior occasion he had been represented by appointed counsel in the superior court in Spokane and informed of his constitutional rights both by his counsel and the judge. He acknowledged, additionally, that once he had been held in jail on a justice court complaint for possessing stolen property and had been represented by an attorney on those charges.

Hearing no evidence from the defendant of coercion, duress, threats or fear, the trial court found the two statements to have been voluntarily made and ruled them admissible.

Where claim is made that a confession has been obtained from a defendant by means of force, violence or fear, that is, through coercion or duress, and that the confession was, therefore, involuntary, it becomes a matter in the first instance for the court to determine whether the confession was in fact involuntary. The mere failure to warn an accused of his right to remain silent does not ipso facto render the statements involuntary. When one knows that he has a constitutional right to remain silent and that whatever he says may be used against him at trial, the fail-

ure to tell him what he already knows does not make his statements inadmissible.

If, from conflicting evidence as to the circumstances surrounding the taking or giving of the confession, the court finds the confession was voluntarily made, it becomes prima facie admissible. *State v. Streeter,* 67 Wn.2d 39, 406 P.2d 590 (1965); *State v. Gersvold,* 66 Wn.2d 900, 406 P.2d 318 (1965); and *State v. Darst,* 65 Wn.2d 808, 399 P.2d 618 (1965). The defendant may, of course, submit anew the question of voluntariness to the jury. We find no error in admitting the two confessions for the record supports the trial court's ruling that they were voluntarily given and the totality of circumstances surrounding the confessions does not lead us to a different conclusion. *Haynes v. Washington,* 373 U.S. 503, 10 L. Ed. 2d 513, 83 Sup. Ct. 1336 (1963).

Next we consider the claim of error directed to the court's withdrawal of the defense of insanity.

Defendant, on arraignment, entered a plea of not guilty and a plea of mental irresponsibility at the time of the alleged commission of the crime charged. Although an encephalographic test had been given defendant and, at his own request, he had been examined by two psychiatrists, he presented no evidence whatever to prove mental irresponsibility or insanity. The court, in instruction No. 4, told the jury to disregard the plea of insanity or mental irresponsibility.

A defense plea of insanity or mental irresponsibility shall be interposed in writing at or before arraignment. RCW 10.76.020. When the plea of insanity or mental irresponsibility is interposed, the burden is on the defendant to prove that defense by a preponderance of the evidence. *State v. White,* 60 Wn.2d 551, 374 P.2d 942 (1962); *State v. Putzell,* 40 Wn.2d 174, 242 P.2d 180 (1952). Accordingly, if defendant wishes the issue of his insanity or mental irresponsibility put to the jury, he must present evidence to support it; if he fails to do so, the court ought not submit that issue to the jury, for it is improper to submit an issue to the jury or instruct as to a theory of a case unless there is evidence to prove it. *State v. Jackson,* 70 Wn.2d 498, 424

P.2d 313 (1967); *State v. Rio*, 38 Wn.2d 446, 230 P.2d 308 (1951). The defendant having presented no evidence to support his special plea of insanity or mental irresponsibility, that issue was correctly withdrawn from the jury.

One other assignment of error merits comment. Defendant contends that his court-appointed counsel was incompetent and failed to compel a fair trial. In *State v. Keller*, 65 Wn.2d 907, 400 P.2d 370 (1965), we noted the frequency with which the incompetence of court-appointed counsel has been urged as a ground for reversal on appeal. Rejecting the argument in that case, we said:

> In recent months we have reviewed the records of other criminal appeals of defendants represented by court-appointed counsel. We note, with increasing concern, that it seems to be standard procedure for the accused to quarrel with court-appointed counsel, or to develop an undertone of studied antagonism and claimed distrust, or to be reluctant to aid or cooperate in preparation of a defense. This appears to be done in order to argue on appeal that the accused was deprived of due process alleging he was represented by incompetent counsel.

Subsequently, on the authority of that case, we again declined to reverse a judgment on the asserted grounds of appointed counsel's incompetence in *State v. Lytle, ante* p. 83, 426 P.2d 502 (1967).

In assessing the comparative skill, learning and devotion of counsel, we recognize that trial practice, despite persistent efforts toward its advancement, remains more of an art than a science. There is no true stereotype of the skilled trial lawyer. He may be handsome or homely, soft-spoken or bombastic, pugnacious or retiring, sophisticated or seemingly naive; he may have the polish and poise of a Shakespearean actor or the tough aggressiveness of an infantryman—or he may effect all of these mannerisms and qualities at different times and situations according to the demands of the occasion as he divines them. The trial record each lawyer makes may differ from that of his equally-skilled fellow attorneys as greatly as does his appearance,

demeanor and personality and the mode and manner of advancing his client's cause.

To assure the defendant of counsel's best efforts then, the law must afford the attorney a wide latitude and flexibility in his choice of trial psychology and tactics. If counsel is to be stultified at trial by a post trial scrutiny of the myriad choices he must make in the course of a trial: whether to examine on a fact, whether and how much to cross-examine, whether to put some witnesses on the stand and leave others off—indeed, in some instances, whether to interview some witnesses before trial or leave them alone—he will lose the very freedom of action so essential to a skillful representation of the accused.

Counsel is not, at the risk of being charged with incompetence, obliged to raise every conceivable point, however frivolous, damaging or inconsequential it may appear at the time, or to argue every point to the court and jury which in retrospect may seem important to the defendant; nor is he obliged to obtain a written waiver or instructions from the defendant as to each and every turn or direction the accused wants his counsel to take.

What may seem important and favorable to the defendant after the trial may during trial have appeared inconsequential or damaging to his attorney. Counsel may, as the trial progressed, have deemed it wise at the time to avoid issues which then seemed frivolous and insubstantial on a sound tactical theory that to bring them up would create an inference that the whole defense was frivolous and insubstantial and might expose the defendant to a devastating rebuttal. For many reasons, therefore, the choice of trial tactics, the action to be taken or avoided, and the methodology to be employed must rest in the attorney's judgment.

Experienced lawyers know that what may appear to be a blunder in tactics at the trial may have been deliberately undertaken with calculated risks; that out-of-court interviews may open the doors to the admission of damaging evidence not otherwise admissible; that questions on cross-examination may elicit surprisingly damaging answers; that what on paper might read as very favorable

testimony to the accused may, in counsel's judgment, when given from the witness stand, appear fabricated and suborned and thus far more damaging than left unsaid. These are but a few of the cogent reasons why a rule has evolved that the competence of counsel must be judged from the whole record and not from isolated segments of it.

■ Where the court appoints a licensed and practicing member of the bar to appear for and represent an indigent defendant in a criminal case, a strong presumption of competence arises from (1) the fact of his appointment by the judge of a trial court, (2) from the fact that counsel is a member of the bar of the highest court of the state, and (3) from the fact that the attorney is regularly and actively engaged in the practice of law. These three factors create a presumption that may be overcome only by a clear showing of incompetence derived from the whole record.

If, therefore, appointed counsel is a regularly practicing member of the bar of the highest court of the state, he is presumed qualified and a judgment will not be reversed on the grounds of incompetence of counsel unless such incompetence appears affirmatively on review so clearly as to show that the accused was thereby deprived of a constitutionally fair trial. *State v. Mode,* 57 Wn.2d 829, 360 P.2d 159 (1961). Our examination of the record shows defendant to have been competently represented.

The other assignments of error being without merit, we affirm the judgment.

FINLEY, C. J., HILL and WEAVER, JJ., and LANGENBACH, J. Pro Tem., concur.