# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

                Respondent,

        v.

JAIME MICHAEL ENGEL,

                Appellant.

DIVISION ONE

No. 80987-3-I

UNPUBLISHED OPINION

DWYER, J. — Jaime Engel appeals from his conviction of rape in the second degree. Engel contends that the trial court erred by (1) denying his motion for a mistrial, and (2) admitting evidence demonstrating that the victim of the rape had been, on a separate occasion, sexually harassed by a former employer. Additionally, Engel asserts that his defense attorneys provided ineffective assistance by not objecting to the exclusion of certain evidence. Finally, Engel contends that cumulative error deprived him of a fair trial. Because Engel fails to establish an entitlement to relief on any of these claims, we affirm.

I

In 2017, R.C. was homeless, addicted to heroin, and engaged in sex work. With no home or vehicle, R.C. slept on the streets around Aurora Avenue North in Seattle. During this time, R.C. frequented the Aurora Commons, a nonprofit community space for people without housing.

When R.C. first met Engel, he was looking for someone who had a form of identification that could be used to rent a motel room on his behalf. R.C. agreed to rent a motel room for Engel. After renting the room, R.C. entered the room with Engel. They then conversed and used drugs. R.C. and Engel did not engage in sexual intercourse on this occasion. However, R.C. informed Engel that she was a sex worker.

After a few hours, R.C. departed the motel alone and went to the Aurora Commons. R.C. was left with the impression that Engel was "a very nice gentleman." At this time, R.C. did not know Engel's name and knew him only by his nickname "Tap Out."

The following week, R.C. saw Engel near the Aurora Commons. Engel asked R.C. whether she would like to make some money. R.C. understood this to mean that Engel wanted to pay her to engage in sexual intercourse with him. R.C. agreed to do so.

R.C. and Engel then took a bus to the Wallingford Inn, where Engel had a room already rented. Engel informed R.C. that "he met some black woman that rented the room for him." While in the room, R.C. and Engel initially chatted about what they had been doing over the previous week. During their conversation, Engel smoked crack cocaine.

R.C. and Engel then left the motel room to purchase heroin for R.C. While on their way back to the Wallingford Inn, R.C. attempted to discuss what services Engel wanted to engage in and how much he would pay for those services. Each time R.C. attempted to discuss these topics, Engel merely informed R.C.

that he would "take care" of her.

When R.C. and Engel arrived back at the motel room, Engel's demeanor changed dramatically. R.C. testified that Engel was "almost instantly . . . a different person." Engel demanded that R.C. "go get well in the bathroom" and told R.C. to "not come out without announcing" herself. Engel also told R.C. that she was a "cheap whore."

When R.C. exited the bathroom, Engel was naked, holding a crack pipe, and watching "some weird workout video on the TV." Engel then told R.C. to "get on the floor and suck his dick." R.C. acquiesced. Over the next several hours, Engel forced R.C. to engage in oral and vaginal sexual intercourse. R.C. testified that Engel "was very forceful, slamming [her] head down on him, grabbing [her] hair, throwing [her] on the bed, [and] pushing [her] down on the bed."

At one point, R.C. started to cry. R.C. asked Engel, "Why are you acting like this to me, why are you being so mean?" Engel then "got really angry." R.C. testified that she "knew then that [she] just needed to do what he told [her] to do and went along with it."

R.C. informed Engel that he was hurting and scaring her. Engel did not respond to these pleadings. While Engel was raping R.C., he grabbed her hand, squeezed it tightly, and said "that's why they call him Tap Out." Engel also told R.C. that "it takes thirty seconds to kill somebody before you realize what you did and it's already too late." R.C. understood this to be a threat. R.C. testified that, because of this threat, she did not resist Engel's actions.

At one point, Engel told R.C. that, if she was too loud and somebody

3

heard her, "he was going to slam his dick in [her] ass." R.C. testified that she "put [her] face into the pillow because [she] was too scared that somebody would hear [her]." R.C. was afraid that she "wasn't going to make it out of that room." R.C. testified that none of the acts of sexual intercourse that Engel forced her to engage in were consensual.

The rape ended when R.C. informed Engel that she was supposed to meet her daughter. R.C. told Engel that her daughter would notify the police if she did not show up. Engel told R.C. that she had 30 seconds to "get out of there, grab [her] shit and go." Engel also threated to kill R.C. and her boyfriend "if [she] told anybody."

After leaving the motel room, R.C. went to the Aurora Commons. When R.C. arrived at the Aurora Commons, she informed a friend that she had been raped. R.C. thought about reporting the incident to the police at that time, but she was afraid that Engel would kill her and her boyfriend. Another friend counseled R.C. to bag her underwear and swab her vagina with cotton swabs in the event that she wanted to report the incident to the police. R.C. testified that her vagina was so "tor[n] up" that she "couldn't sit down for almost a month."

The following day, R.C. informed Lisa Carlson, a founder of the Aurora Commons, that she had been raped by "Tap Out." R.C. also gave Carlson the bag containing the underwear and cotton swabs. Carlson encouraged R.C. to report the rape to the police if she ever felt ready to do so. R.C. did not indicate an interest in reporting the rape at that time. However, R.C. permitted Carlson to inform the police of the rape and to give them the bag containing the underwear

4

and cotton swabs.

Carlson telephoned Detective Michael Settle of the Seattle Police Department and informed him of the rape. Carlson did not provide R.C.'s name to Detective Carlson. After Carlson informed Detective Settle of the rape, Detective Settle retrieved the bag containing the underwear and cotton swabs from Carlson.

Approximately two months after the rape, R.C. informed a detective that she had been raped by "Tap Out." This detective contacted Detective Settle, who arranged an interview with R.C. about the incident. During the course of the investigation, Detective Settle learned that the individual nicknamed "Tap Out" may be Engel. Detective Settle compiled a photomontage that included a photograph of Engel. Detective Settle asked another detective to show the photomontage to R.C. When R.C. saw the photomontage, she identified Engel as being the individual who had raped her.

The State charged Engel with two counts of rape in the second degree. The first count alleged that Engel raped R.C. The second count alleged that Engel raped another person, M.T.C. Prior to trial, the court granted a motion to sever count two from count one. The trial court granted the motion.

Following a jury trial on count one, the rape of R.C., Engel was found guilty as charged. Engel subsequently pleaded guilty to one count of rape in the third degree. This count alleged that Engel raped two people, M.T.C. and G.M. With regard to count one, the trial court sentenced Engel to an indeterminate sentence of 270 months of incarceration to life. With regard to the count of rape

5

in the third degree, the trial court sentenced Engel to 60 months of incarceration to run concurrently with the sentence imposed for count one.

Engel appeals.

II

Engel contends that the trial court erred by denying his motion for a mistrial. Specifically, Engel asserts that he was entitled to a mistrial because witness testimony referenced prejudicial evidence that was excluded by the trial court pursuant to a pretrial ruling. Because Engel fails to show that he was prejudiced by the improper testimony, we disagree.

"We review the trial court's denial of a mistrial for abuse of discretion, and we find abuse only 'when no reasonable judge would have reached the same conclusion.'" State v. Emery, 174 Wn.2d 741, 765, 278 P.3d 653 (2012) (internal quotation marks omitted) (quoting State v. Hopson, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989)). "The trial court should grant a mistrial only when the defendant has been so prejudiced that nothing short of a new trial can ensure that the defendant will be fairly tried." Emery, 174 Wn.2d at 765. "'In determining the effect of an irregularity, we examine (1) its seriousness; (2) whether it involved cumulative evidence; and (3) whether the trial court properly instructed the jury to disregard it.'" Emery, 174 Wn.2d at 765 (quoting Hopson, 113 Wn.2d at 284). These factors are considered with deference to the trial court "because the trial court is in the best position to discern prejudice." State v. Garcia, 177 Wn. App. 769, 776-77, 313 P.3d 422 (2013).

Prior to trial, Engel moved to exclude the admission of any testimony regarding a "bad date list." According to Engel's motion to exclude, the "bad date list" was a document that was kept at the Aurora Commons containing descriptions of perpetrators who had sexually assaulted women engaged in sex work. During a pretrial hearing, the trial court granted the motion to exclude this evidence.

During the trial, Detective Settle mentioned the existence of the "bad date list" when he was asked about his previous conversations with individuals at the Aurora Commons:

> [THE STATE]: And are you -- tell us sort of some of the conversations or types of conversations that you've had with those in your line of work.
> [DET. SETTLE]: A lot of conversations but, you know, many of the conversations have been contacts where [Lisa Carlson] would contact me about a woman that wanted to report a crime or something that she had heard in the Commons related to crime, maybe. And so multiple conversations over the years regarding that. And then other conversations, too, just that -- they have a bad date list at the Commons which is --
> [DEFENSE COUNSEL]: Objection, your Honor. Move to strike.
> THE COURT: Sustained. The jury will disregard that. Really, Detective, answer the question.

Engel subsequently moved for a mistrial, asserting that the improper testimony was prejudicial and violated the trial court's order to exclude any mention of the "bad date list." The trial court denied the motion, reasoning that there was no deliberate violation of the order and Engel was not prejudiced because the improper testimony "was cut off at the pass."

The trial court did not err by denying Engel's motion for a mistrial. A reasonable judge could have concluded that the elicited testimony was not

serious. The mention of the "bad date list" was brief, and Detective Settle's testimony was cut off by an objection before he could explain what the "bad date list" was. As such, it is speculative to assume that the jury both understood what the "bad date list" was and inferred that Engel was on the list.

Given that the improper testimony provided the only mention of the "bad date list" during the trial, the evidence was not cumulative. However, the trial court immediately instructed the jury to disregard the testimony. It is well established that "jurors are presumed to follow the court's instructions." Emery, 174 Wn.2d at 766. Engel fails to demonstrate that the court's instruction was ineffective.

Accordingly, the trial court did not err by denying the motion for a mistrial.

III

Engel asserts that the trial court erred by admitting testimony that R.C. had been a victim of sexual harassment several years before she was raped by Engel. According to Engel, this testimony should have been excluded as being irrelevant and unduly prejudicial. Because this evidence was material to R.C.'s credibility, we disagree.

We review a trial court's ruling on the admissibility of evidence for abuse of discretion. State v. Darden, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002). "Abuse exists when the trial court's exercise of discretion is 'manifestly unreasonable or based upon untenable grounds or reasons.'" Darden, 145 Wn.2d at 619 (quoting State v. Powell, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." ER 401. Relevant evidence is generally admissible. ER 402. "The threshold to admit relevant evidence is very low. Even minimally relevant evidence is admissible." Darden, 145 Wn.2d at 621. However, relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

During a pretrial hearing, Engel requested that the trial court exclude testimony that R.C. was sexually harassed by an employer several years prior to the incident at issue. Engel argued that the testimony was both irrelevant and prejudicial. The trial court denied the request, reasoning that the evidence was material to explaining why R.C. became both homeless and engaged in sex work:

> THE COURT: . . . But, you know, I think the State and the defense always have the challenge of presenting the people that they're dealing with to the jury in a way that the jury can understand. And the more remote a witness or a defendant's circumstances are from the jury, the more explanation is required. You know, many jurors don't understand what it's like to live on the street or why anybody would ever end up there. There's a huge amount of hostility right now in our community that's been whipped up by some of our local media outlets against anybody who's living on the street. Apparently they're all supposed to be just awful people who are out there because they're awful people.
> And I think almost everybody's who's been homeless or close to homeless people knows, you know, how easy it is to other people who are living a different lifestyle than our jurors are.

You know, as I just said earlier, jurors have a hard time understanding sex work because most jurors don't have contact with that either.

. . . .

So I think when the State is looking at a witness like [R.C.] who is living a lifestyle very different from the jurors and knows that the jurors may be thinking that's because [R.C.] is some bad worthless person to begin with and that's why she's out on the street, it's fair for the State to at least have her explain how she ended up in the circumstances she did.

The trial court offered to provide the jury with a limiting instruction. However, Engel declined the limiting instruction and conceded that the testimony would result in "no connection" to him.

The trial court did not err by denying Engel's request to exclude the evidence. Where, as here, "a case stands or falls on the jury's belief or disbelief of essentially one witness, that witness' credibility or motive must be subject to close scrutiny." State v. Roberts, 25 Wn. App. 830, 834, 611 P.2d 1297 (1980). "In the prosecution of sex crimes, the right of cross-examination often determines the outcome. In such cases, the credibility of the accuser is of great importance, essential to prosecution and defense alike." Roberts, 25 Wn. App. at 834-35. During the trial, R.C. testified that, as a result of being sexually harassed by her former employer, she lost her job and "ended up homeless." This evidence provided an explanation as to how R.C. became homeless and, in turn, why she engaged in sex work. As such, the evidence was material to R.C.'s credibility.

Accordingly, the trial court did not err by admitting the evidence.

IV

Engel next contends that his attorneys were constitutionally ineffective for not objecting to the exclusion of evidence demonstrating that Engel was on a "no

10

rent list"[1] at the motel in which he raped R.C. Because, by so doing, Engel's attorneys employed a legitimate trial tactic, we disagree.

The defendant bears the burden to prove ineffective assistance of counsel. State v. McFarland, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). To meet this burden, the defendant must establish that

> (1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.

McFarland, 127 Wn.2d at 334-35.

"To combat the biases of hindsight, our scrutiny of counsel's performance is highly deferential and we strongly presume reasonableness." In re Pers. Restraint of Lui, 188 Wn.2d 525, 539, 397 P.3d 90 (2017). "For many reasons . . . the choice of trial tactics, the action to be taken or avoided, and the methodology to be employed must rest in the attorney's judgment." State v. Piche, 71 Wn.2d 583, 590, 430 P.2d 522 (1967). "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland v. Washington, 466 U.S. 668, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). "When counsel's conduct can be characterized as legitimate trial strategy or tactics, performance is not deficient." State v. Kyllo, 166 Wn.2d 856, 863, 215 P.3d 177 (2009).

---

[1] This is a different list than the "bad date list" previously discussed.

11

Engel asserts that his attorneys performed deficiently by failing to object to the exclusion of evidence demonstrating that he was on a "no rent list" at the Wallingford Inn. The manager of the Wallingford Inn, Eva Milo, kept a "no rent list," which was comprised of people who were not permitted to rent rooms at the inn. Engel's name was on that list. During a pretrial hearing, the State indicated that it had come to an agreement with defense counsel to exclude evidence demonstrating that Engel was on the "no rent list":

> [THE STATE]: . . . [E]va will testify -- she will testify that she knows him to be somebody who had rented rooms there before, but we would agree . . . that the reason why -- that her reminder of his identification because he's on a no-rent-to-any-longer list is prejudicial. So we're going to lead.
> . . . .
> THE COURT: Okay. All right. Granted. With -- and then the understanding is that the State will lead here to avoid violating this motion in limine.

Engel contends that evidence demonstrating that he was on the "no rent list"—to the exclusion of evidence as to why he was on the list—was important to establishing that he was guilty of only rape in the third degree. This is so, Engel avers, because his "defense turned on jurors finding that [the] demands, threats, and force during the course of the rape were used – not to force compliance with the sex acts – but to make sure no one was alerted to anything occurring inside the room during or after the rape."[2] According to Engel, evidence demonstrating that he was not authorized to rent a room at the motel supported such a defense.

---

[2] Br. of Appellant at 24.

Additionally, Engel asserts that this evidence was important to providing an explanation as to why he had another person rent the room on his behalf.

However, Engel's attorneys' decision to not object to the exclusion of the "no rent list" was a legitimate trial tactic. Indeed, evidence indicating that Engel was not permitted to rent a room at the Wallingford Inn may have been prejudicial to his defense. Without knowing the reason why Engel was not permitted to stay at the Wallingford Inn, the jury may have been left to speculate as to any number of unfavorable explanations for his banishment.

Additionally, other evidence adduced at trial tended to support the defense theory of the case more strongly. The evidence adduced at trial was that Engel had paid to engage in sexual intercourse in a motel room wherein heroin and crack cocaine were located. During closing argument, one of Engel's attorneys argued that, in light of this evidence, Engel may have had reasons for threatening R.C. aside from compelling her to engage in sexual intercourse:

> [DEFENSE COUNSEL]: . . . His purpose was not to force the sex. Let's turn to the other reason. He says, "Don't let anybody outside hear you, neighbors or the people who are walking outside the door or the room. Don't let anybody hear you." Why would he say something like that? Sure, maybe it's because he doesn't want to be caught in the act of non-consensual sex. Maybe it's because he has got heroin and cocaine in his room. Maybe it's because he is engaged in the act of prostitution which we know is illegal. Maybe it's because he knows he didn't use his own ID to get that room. Best case scenario, he gets kicked out in the middle of the night and has no place to live or go. Worst-case scenario, 911 gets called and he gets picked up. So the purpose of these threats, again, is not to force compliance with sex, he has alternative motives, "Don't tell anybody, don't let anybody hear you."

Thus did defense counsel put the tactical decision to good use.

13

In short, Engel fails to show deficient performance.  Because both prongs of the ineffective assistance of counsel test must be met for appellate relief to be warranted, the failure to demonstrate either prong ends our inquiry.[3]  State v. Classen, 4 Wn. App. 2d 520, 535, 422 P.3d 489 (2018).

Affirmed.

Dwyer, J.

WE CONCUR:

Chun, J.                         Smith, J.

---

[3] Engel also asserts that cumulative error deprived him of a fair trial.  "The cumulative error doctrine applies when several trial errors occurred and none alone warrants reversal but the combined errors effectively denied the defendant a fair trial."  State v. Jackson, 150 Wn. App. 877, 889, 209 P.3d 553 (2009).  Because no trial errors occurred, there was no cumulative error.