60 P.3d 1215 (2002)
114 Wash.App. 781
STATE of Washington, Respondent,
v.
Mario Andre SOLOMON, Also known as Mario A. George, Appellant.
No. 20606-8-III.
Court of Appeals of Washington, Division 3, Panel Two.
December 31, 2002.
*1217 Susan M. Gasch, Spokane, for Appellant.
Kevin M. Korsmo, Andrew J. Metts, Deputy Prosecuting Attorney, Spokane, for Respondent.

*1216 OPINION PUBLISHED IN PART
BROWN, C.J.
A jury convicted Mario Solomon of one count of unlawful imprisonment and acquitted him of one count of third degree assault. On appeal, Mr. Solomon contends the trial court erred in admitting certain of his statements. Mr. Solomon also argues the trial court erred in admitting alleged hearsay. We re-examine our review standard for determining when a suspect is in "custody" for Miranda[1] purposes, reject Mr. Solomon's contentions, and affirm.

FACTS
The State charged Mario Solomon with one count of unlawful imprisonment and one count of third degree assault. The State further alleged Ms. Tracy Vaughn was the victim of both offenses.
At the CrR 3.5 hearing, Spokane City Police Officer Shane Oien testified about four contacts with Mr. Solomon. The four contacts led to four statements that became the focus of the CrR 3.5 hearing.
First, in response to a call instigated by Mr. Solomon, Officer Oien contacted Mr. Solomon at his residence where he complained of being burglarized. Mr. Solomon told Officer Oien that Ms. Vaughn had burglarized him, he had detained her, and she had escaped. Officer Oien then spoke to Ms. Vaughn. Based upon Ms. Vaughn's information, he was unsure what had transpired.
Officer Oien then spoke to Mr. Solomon a second time. Mr. Solomon admitted smoking crack all night and into that morning, but he still believed Ms. Vaughn had burglarized him, and that he had detained her in the bathroom. Next, Officer Oien spoke with Seth Keturakat, another witness prompting a third contact with Mr. Solomon.
In this third contact, Officer Oien tried to determine an entry point. Mr. Solomon's story "did not make much sense, and he appeared to be rambling on about a non-occurrence." Report of Proceedings (RP) at 8. Mr. Solomon admitted to the officer that he became paranoid while smoking crack *1218 "and was unsure of what had happened." RP at 8. Officer Oien asked Mr. Solomon if he had threatened Ms. Vaughn, and Mr. Solomon replied that he did not threaten her physically, just verbally to get information about the alleged burglary. Then, Officer Oien spoke again to Mr. Keturakat.
The fourth contact with Mr. Solomon followed to talk about a stick Mr. Solomon allegedly used to beat Ms. Vaughn. Before questioning, Officer Oien told Mr. Solomon he was going to advise him of his constitutional rights so he could ask "more in-depth questions about the incident." RP at 9. Officer Oien testified he read Mr. Solomon his rights from what the deputy prosecutor termed "a standard card." RP at 9. Officer Oien did not have the card at the CrR 3.5 hearing because it was not attached to his police report. According to Officer Oien, Mr. Solomon waived his constitutional rights and denied hitting Ms. Vaughn with the stick. Mr. Solomon did admit having a knife. Mr. Solomon refused the officer's request to search his residence for the stick. Officer Tami Scott testified that Officer Oien read Mr. Solomon his constitutional rights "per Miranda." RP at 15.
Officer Oien speculated on cross-examination that he probably would have kept Mr. Solomon from leaving the scene after he had talked with Ms. Vaughn about her alleged assault. The officer indicated his conversation with Ms. Vaughn "probably, changed mymy idea about the call I was on if he wants to leave after he was the victim of a burglary." RP at 13.
The trial court admitted Mr. Solomon's statements with the exception of his admission made during the third contact that he threatened Ms. Vaughn verbally, but not physically with a stick. The trial court later entered written conclusions of law and findings of fact.
At trial, Ms. Vaughn testified she went over to Mr. Solomon's house to buy crack cocaine. There, she met Mr. Solomon and Mr. Keturakat. She said Mr. Solomon was upset about some missing drugs and was "strip searching, pretty much," Mr. Keturakat. RP at 26. Then the three of them smoked drugs. Ms. Vaughn testified Mr. Solomon became "real paranoid" and went through her purse. RP at 26. Mr. Solomon found a list of telephone numbers in the purse and accused Ms. Vaughn of stealing them from his residence. Mr. Solomon then began chasing her around the house with a knife. She ran into the bathroom to escape, but Mr. Solomon detained her there.
Ms. Vaughn said Mr. Solomon interrogated her and hit her with a stick "for every wrong answer." RP at 30. Ms. Vaughn testified that getting hit repeatedly was so painful she fabricated a story about burglarizing Mr. Solomon's house. The story persuaded Mr. Solomon to leave the bathroom to make a corroborating phone call. Mr. Solomon left Mr. Keturakat with Ms. Vaughn. Mr. Keturakat turned around, perhaps intentionally, thus allowing Ms. Vaughn an opportunity to escape through the bathroom window. Ms. Vaughn said she spent more than 20 minutes in the bathroom against her will.
Ms. Vaughn said she returned a short time later to talk to the police officers who had responded to Mr. Solomon's burglary call. There, she told the police officers her version of the story and showed them her bruises. Numerous photographs of Ms. Vaughn's injuries were shown to the jury.
Officer Oien's testimony was generally consistent with that given at the CrR 3.5 hearing but omitted the suppressed statements. The officer said Mr. Solomon admitted in his initial contact with the officer that he had detained Ms. Vaughn in the bathroom.
On cross-examination, Officer Oien, relying on his police report, stated that Ms. Vaughn reported to him that Mr. Solomon detained her immediately upon her arrival. After the officer spoke to Mr. Solomon again, he returned to Ms. Vaughn, who elaborated on the reasons for being detained. The officer read a brief portion of his report containing Ms. Vaughn's statement.
Over Mr. Solomon's hearsay objection, the State asked Officer Oien to give more detail on Ms. Vaughn's statements. The officer then read a more extensive portion of Ms. Vaughn's statements from his police report.
After the trial court denied Mr. Solomon's motion to dismiss the unlawful imprisonment charge, Mr. Solomon testified he, Mr. Keturakat *1219 and Ms. Vaughn were sitting around his house smoking crack cocaine. He said Ms. Vaughn got "real nervous" and got up to make a phone call. RP at 105. According to Mr. Solomon, a bunch of telephone numbers belonging to him fell out of Ms. Vaughn's purse. He said he confronted Ms. Vaughn about the numbers and informed her that someone had broken into his house "because a lot of stuff was misplaced and missing." RP at 106. Mr. Solomon said Ms. Vaughn admitted stopping by his house the night before with some friends but left because he was not home.
Mr. Solomon said at that point he suspected Ms. Vaughn of breaking into his house, so he started asking her more questions. He grabbed a knife "to kind of scare her a little bit so she could tell the truth." RP at 108.
According to Mr. Solomon, he and Ms. Vaughn went into the bathroom, leaving the door open while Mr. Keturakat stood by and watched Mr. Solomon ask Ms. Vaughn about the break-in. Mr. Solomon said he just wanted to find out what happened. He said Ms. Vaughn then told him that she and some friends stole a check from his house and were planning to cash it.
Mr. Solomon said he went to make some phone calls to check Ms. Vaughn's story when she escaped out the bathroom window. He said he and Mr. Keturakat grabbed her legs and tried to pull her back into the house but failed.
Mr. Solomon stated that he believed he was acting legally when he detained Ms. Vaughn and intended to call the police if her story did not check out. He denied hitting or injuring her. And Mr. Solomon claimed Ms. Vaughn came by his place about a week later to apologize and tell him that she had lied to the police.
On cross-examination, Mr. Solomon denied telling the police he was paranoid from drugs. He admitted that at the time he detained Ms. Solomon, he knew at most she had his alleged telephone numbers. He admitted also that the telephone numbers had no monetary value. Mr. Solomon said he did not call the police while he detained Ms. Vaughn in his bathroom because, "[t]here was not enough evidence for that. What am I going to charge her with? Stealing her (sic) telephone numbers?" RP at 126.
The jury returned a verdict of guilty on the unlawful imprisonment count and not guilty on the assault count. The jury answered "no" on a special verdict form asking whether Mr. Solomon's use of force was lawful. Clerk's Papers (CP) at 31. The trial court imposed a high standard range sentence of three months.
Mr. Solomon appealed.

ANALYSIS

Mr. Solomon's Statements
The general issue is whether the trial court committed reversible error in admitting certain of Mr. Solomon's statements. Discrete sub-issues are discussed: whether Miranda warnings were required at the second point of contact between Officer Oien and Mr. Solomon; and whether there was sufficient evidence of the Miranda warnings given and whether Mr. Solomon knowingly and voluntarily waived his constitutional rights.
The Second Contact
The issue is whether the trial court erred in not suppressing statements uttered during his second contact with Officer Oien. In essence, Mr. Solomon argues the Miranda warnings should have been given before the second contact.
Whether an officer should have given Miranda warnings to a defendant depends on whether the examination or questioning constituted (1) a custodial (2) interrogation (3) by a state agent. State v. Post, 118 Wash.2d 596, 605, 826 P.2d 172, 837 P.2d 599 (1992). Here, the custodial aspect of Miranda is at issue.
A defendant is in custody for purposes of Miranda when his or her freedom of action is curtailed to a "degree associated with formal arrest." California v. Beheler, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (citing Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977)); see also State v. Harris, 106 Wash.2d 784, 789, 725 P.2d 975 (1986).
*1220 Whether the defendant was in custody is a mixed question of fact and law. Thompson v. Keohane, 516 U.S. 99, 112-13, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995). The factual inquiry determines "the circumstances surrounding the interrogation." Id. at 112, 116 S.Ct. 457. The legal inquiry determines, given the factual circumstances, whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." Id. This second, legal, inquiry "calls for application of the controlling legal standard to the historical facts." Id. at 113, 116 S.Ct. 457. As the Thompson court summarized: "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve `the ultimate inquiry': `[was] there a `formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest.'" Id. (quoting Beheler, 463 U.S. at 1125, 103 S.Ct. 3517 (quoting Mathiason, 429 U.S. at 495, 97 S.Ct. 711)).
To date, no Washington appellate court has cited Thompson, which holds the custody determination is a mixed question of law and fact.[2]Thompson, 516 U.S. at 113, 116 S.Ct. 457. Relying partly on a pre-Thompson United States Supreme Court opinion, the Washington Supreme Court held that the "sole inquiry" was "whether the suspect reasonably supposed his freedom of action was curtailed." State v. Short, 113 Wash.2d 35, 41, 775 P.2d 458 (1989) (citing State v. Watkins, 53 Wash.App. 264, 274, 766 P.2d 484 (1989)); see also Berkemer v. McCarty, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoted with approval in both Short and Watkins). The United States Supreme Court has since clarified that the custody inquiry is more complex, requiring first an exploration of the historical facts and then, relying on those facts, an objective determination of the defendant's view of his or her situation. Thompson, 516 U.S. at 112-13, 116 S.Ct. 457.
Very recently, this court stated that the Miranda custody determination is reviewed de novo. City of College Place v. Staudenmaier, 110 Wash.App. 841, 848, 43 P.3d 43 (2002). But in Staudenmaier, the facts were not in dispute and this court reviewed a superior court's ruling on an appeal from a municipal court conviction. See id. at 845-48, 43 P.3d 43. Here, we review the trial court's findings of fact and conclusions of law.
In a CrR 3.5 proceeding, the trial court's findings of fact address the Thompson factual inquiry. See Thompson, 516 U.S. at 112, 116 S.Ct. 457. The substantial evidence standard of review applies to the trial court's challenged findings. State v. Broadaway, 133 Wash.2d 118, 131, 942 P.2d 363 (1997). Unchallenged findings are verities on appeal. Id.
The CrR 3.5 findings of fact set the stage for the Thompson legal inquiry. Accordingly, the trial court's CrR 3.5 conclusions of law address whether a reasonable person in the defendant's situation would have believed "he or she was not at liberty to terminate the interrogation and leave." Thompson, 516 U.S. at 112, 116 S.Ct. 457; see also Short, 113 Wash.2d at 41, 775 P.2d 458 (stating that the reviewing court determines whether the defendant "reasonably supposed his freedom of action was curtailed"). De novo review applies to this legal question to the extent that the trial court must apply "the controlling legal standard to the historical facts." Id. at 113, 775 P.2d 458. Stated another way, this court must determine de novo whether the trial court "derived proper conclusions of law" from its findings of fact. State v. Armenta, 134 Wash.2d 1, 9, 948 P.2d 1280 (1997) (citing State v. Hill, 123 Wash.2d 641, 647, 870 P.2d 313 (1994)). With the standard of review thus clarified, this court must now apply it to Mr. Solomon's appeal.
Mr. Solomon challenges one portion of Finding of Fact 6, which describes the third contact between Officer Oien and Mr. Solomon. The challenged portion of the finding states, "At that point, the Officer probably would not have permitted Mr. Solomon to leave." CP at 51 (FF 6).
*1221 As discussed, the substantial evidence standard applies. Broadaway, 133 Wash.2d at 131, 942 P.2d 363. "Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding." State v. Mendez, 137 Wash.2d 208, 214, 970 P.2d 722 (1999) (citing Hill, 123 Wash.2d at 644, 870 P.2d 313).
The following exchange took place during the CrR 3.5 hearing:
[Defense Counsel:] After Ms. Vaughn told you that Mr. Solomon had been using drugs and had hit her with the stick several times leaving injuries, was Mr. Solomon free to pack up and leave or would you have stopped him to keep your investigation going?
[Officer Oien:] I probably would have kept him from leaving the scene.
RP at 12.
Officer Oien's speculative testimony can be viewed as his opinion that if Mr. Solomon had decided to leave after having been confronted with Ms. Vaughn's allegations of assault, it would be considered flight and evidence of guilt. If those were the facts, Mr. Solomon would then have been detained. However, the flaw in Mr. Solomon's argument is that Mr. Solomon did not attempt to flee. Thus, Officer Oien's speculation is irrelevant to the issue of whether Mr. Solomon believed he would have been free to leave at that point. Therefore, the trial court did not err when permitting statements derived at the second contact.
Further, an unchallenged finding exists in connection with the second incident of contact, "Mr. Solomon was neither arrested nor coerced." CP at 50 (FF 5). This unchallenged finding clarifies to a considerable degree Officer Oien's unarticulated speculation about keeping Mr. Solomon at the scene.
Moreover, as noted, Officer Oien's unstated thoughts are irrelevant; a police officer's "unarticulated plan has no bearing on the question whether suspect was `in custody' at a particular time." Berkemer, 468 U.S. at 442, 104 S.Ct. 3138. The relevant historical facts lend insight on how a reasonable person in Mr. Solomon's position would have understood his or her situation. Thompson, 516 U.S. at 112, 116 S.Ct. 457; Berkemer, 468 U.S. at 442, 104 S.Ct. 3138; Short, 113 Wash.2d at 41, 775 P.2d 458.
The trial court's unchallenged findings indicate no aspect that the officer's first two encounters with Mr. Solomon were coercive or constraining in nature notwithstanding the officer's unstated thoughts. In light of those circumstances, no reasonable person in Mr. Solomon's situation would have thought he or she was constrained in a manner consistent with formal arrest. Thompson, 516 U.S. at 112, 116 S.Ct. 457; Short, 113 Wash.2d at 41, 775 P.2d 458. Accordingly, the trial court did not err in admitting Mr. Solomon's earlier statements.
Affirmed.
A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder, having no precedential value, shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
SCHULTHEIS, J., and KATO, J., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] A respected commentator on Washington criminal procedure has noted the Thompson court's two-part inquiry. See 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE, CRIMINAL PRACTICE AND PROCEDURE § 3307, at 772 n. 5 (1997).