# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51699-3-II |
| Respondent, | |
| v. | |
| DAVID DORRANCE ROQUE GASPAR, | UNPUBLISHED OPINION |
| Appellant. | |

WORSWICK, J. — David Roque Gaspar appeals his convictions for four counts of first degree child rape of his cousin, A.G. Roque Gaspar argues that the trial court violated his right to present a defense by excluding evidence supporting his theory that A.G. fabricated the rape allegations in order to move away from her father's strict rules. He also argues that the trial court erred by admitting the video of his interrogation following a CrR 3.5 hearing, because his statements were involuntary. We disagree and affirm.

## FACTS

A.G. lived in Washington with her family when she was between the ages of 9 and 11 years old. During that time she lived in a house with her parents, four sisters, A.G.'s aunt, Graciela, and her husband, Graciela's four children, and Graciela's father. When A.G. was 11 years old, her parents separated, and she moved to Arizona with her mother. Two years later, A.G. moved back to Washington to spend time with her father, Francisco.[1] When A.G. was 14

---

[1] Because several people in this document share a last name or part of a last name, this opinion refers to some people by their first names for clarity. We intend no disrespect.

years old, she disclosed to her Aunt Rosa that Graciela's son, Roque Gaspar, had sexually abused her when she had previously lived in Washington. Shortly after, A.G. moved back to Arizona to live with her mother.

Upon returning to Arizona, A.G. disclosed the sexual abuse to a nurse, who contacted Arizona law enforcement. Eventually, Detective Patricia Song of the Tacoma Police Department was assigned to the case. Detective Song contacted Roque Gaspar, who agreed to a recorded interview with Detective Song and her colleague. The interview lasted about an hour and forty minutes. The State ultimately charged Roque Gaspar with four counts of first degree child rape.

The trial court held a CrR 3.5 hearing regarding the admissibility of Roque Gaspar's statements to police. In Roque Gaspar's memorandum concerning the CrR 3.5 hearing, he conceded that *Miranda* warnings were properly given, but argued that his statements constituted an involuntary confession due to the detective's interrogation strategies.

At the CrR 3.5 hearing, Detective Song testified that the interview occurred in an interview room at the criminal investigations division. Detective Song began the interview by reading two forms to Roque Gaspar—permission to record the interview and an advisement of his rights. Roque Gaspar waived his rights and signed the permission to record form.

At one point during the interview, Detective Song told Roque Gaspar he would be "in a world of hurt." Verbatim Report of Proceedings (VRP) at 41. Detective Song explained that she meant that Roque Gaspar would appear dishonest in the interview recording and "might have to pay for what he did in court." VRP at 41. At no point did Detective Song or her colleague directly threaten Roque Gaspar. Roque Gaspar was not placed in handcuffs or other restraints during the interview. Detective Song acknowledged using deception during the interview, such

as presenting the scenario to Roque Gaspar that perhaps he had engaged in a consensual sexual relationship with A.G., despite that A.G. was nine years old at the time.

Roque Gaspar testified at the CrR 3.5 hearing as follows. Roque Gaspar graduated from high school after being held back a year as a sophomore because he failed to do his homework. He did not have a learning disability and was pretty smart. After high school, he worked at a farm as a warehouse worker. After witnessing police arrest his uncle, Roque Gaspar developed a fear of authority. During his interview at the police station, the detectives read Roque Gaspar his constitutional rights. Roque Gaspar originally told detectives that he had not had intercourse with A.G. but later admitted to some sexual activity between the two because the detectives made it seem as though it would be okay compared to the original accusations. No one made any threats or promises to him during his interview.

The trial court failed to file written findings of fact and conclusions of law as required by CrR 3.5, but instead issued oral findings and conclusions. The trial court noted that there were no disputed facts, and that the parties agreed that *Miranda* warnings were appropriately given. The trial court concluded that the deceptive statements made by Detective Song, such as suggesting that Roque Gaspar possibly had a consensual relationship with nine-year-old A.G., did not rise to the level of overcoming Roque Gaspar's free will. The trial court also concluded that Detective Song did not induce Roque Gaspar to make any statements. The trial court stated, "[T]his was not a case where the detectives were overbearing. They were not in the defendant's face. They were not loud. I did not find them aggressive. They were relatively gentle, I would say, in their questioning of the defendant." VRP at 100. The trial court further concluded that

the length of the interrogation was not unduly long and that the location of the interrogation at the police station was not unduly coercive.

The trial court concluded that Roque Gaspar's condition, maturity, education, physical condition, and mental health was sufficient for him to knowingly, voluntarily, and intelligently waive his constitutional rights. Finally, the trial court concluded that the statements made by Roque Gaspar during his interrogation were admissible.

The State filed a motion in limine to "[e]xclude any evidence or argument suggesting that A.G. was promiscuous or that she received text messages from several boys." Clerk's Papers (CP) at 16. This was based on discovery evidence that A.G.'s aunt, a defense witness, "did not believe A.G.'s disclosure because she was receiving a lot of texts from different boys." CP at 16. Roque Gaspar opposed the State's motion in limine, arguing that he should be permitted to admit evidence that "A.G.'s motive for making her allegations against the defendant and requesting that she be flown back to her mother's home in Arizona was her unhappiness with her father's accusations that she was socializing with boys too often." CP at 72.

At a hearing on the motion, Roque Gaspar opposed the State's motion in limine, explaining his intention to offer testimony from A.G.'s aunt that A.G. had been receiving text messages from boys around the time she made her allegations, which led to conflict between A.G. and her conservative family, giving her motive to fabricate rape allegations. The trial court reserved ruling on the issue and instructed Roque Gaspar to bring up the issue outside the presence of the jury before raising the topic with any witness.

No. 51699-3-II

Prior to opening statements, the parties and the trial court attempted to clarify the trial court's position on the State's motion in limine. The trial court explained:

> I think what we need to do for opening . . . is avoid those issues, because I'm not going to rule on those before opening. And so the issue of promiscuity, whether this comes from text messages or comes from—there's at least one statement I remember in the disputed video about—where Detective Song, I believe, said that—I haven't made rulings on that, so I think that needs to be avoided in opening statement.

VRP at 431.

In his opening statement, Roque Gaspar argued that A.G. made up the story of him raping her in order to move away from her father's strict home.

> She was looking forward to a coming-out party . . . it's called a quinceanera. And what happened was, over a period of time . . . her family—they're very conservative, and they had some concerns about her behavior . . . . She was upset with her father, with her—and with her aunts because she felt like she was under surveillance. She was unhappy—she was happy when she came back, but then she became unhappy, and it was at that time that she came up with this story about being raped by [Roque Gaspar].

VRP at 446. He continued, "These rapes never happened. This was an unhappy adolescent, unhappy with where she was. She wanted to get out of living up here. She has not been back since. She's—now she gets what she wants." VRP at 450.

Prior to Roque Gaspar's cross-examination of A.G., the parties and the trial court revisited the pending motion in limine. Roque Gaspar explained that he intended to elicit testimony from A.G. that she was talking to boys and that her father was not happy about it. The trial court ruled that line of questioning admissible. On cross-examination, Roque Gaspar asked A.G. whether her father questioning her about a neighborhood boy upset her. A.G. said it did not.

5

A.G.'s father, Francisco, testified in Roque Gaspar's defense. He testified that he canceled A.G.'s quinceanera after he saw her kissing a boy. Francisco recalled that a week or two after he cancelled the quinceanera, A.G. made her allegations against Roque Gaspar.

Roque Gaspar presented his closing argument:

Her father starts putting some very strict rules on her. And frankly they were a little bit—I mean, they weren't—it wasn't a 21st century approach to this, I would have to say that. Father is telling her, "I'm going to watch you and I don't want you to do certain things." It had to do with boys, but that's got really nothing to do with—the reason isn't important. What's important is that he was restricting who she could associate with, and he was—he was watching her, and Aunt [Rosa] was watching her. Rosa . . . was watching her too. So the father says at a point, "I'm going to cancel the quinceanera."
. . . .
Now, when the father—when he told her that that quinceanera was cancelled because of her behavior, what he thought was bad behavior on her part—it's kind of restrictive, to be honest—she was just—anyway. Then she indicated, "I want to go back to Arizona. If that's the way you feel, Dad, I want to go home." And then he says, "I can't have you flying back and forth. You need to stay here." You know. So he reveals to her he's changing the custody arrangement. He wants her to stay here. She—and she's now unhappy about staying here, and then she has the—then she has her Aunt Rosa also chastising her for what she's doing. "I've seen you walking into a house with a boy." So at that point she—she says—and it's interesting. This is when she starts talking about being raped. It's after she's been told that the quinceanera's cancelled, and that made her angry, and that father insists on having her stay in—with him. So then she says, "I want to go home."
. . . Once she revealed the rapes—the alleged rapes—her story, then within a couple of days, father's taking her to the airport, flying her back to Arizona, and then she's lived there ever since. She's out of this restrictive environment where certain things can't—where her life is circumscribed. And so there's—there's a possible motive.

CP at 1359-62.

The jury found Roque Gaspar guilty of all four charges. Roque Gaspar appeals.

ANALYSIS

I. RIGHT TO PRESENT A DEFENSE

Roque Gaspar argues that the trial court erred by excluding evidence supporting his theory that A.G. fabricated the rape allegations in order to move away from her father's strict rules and as a result, violated his right to present a defense. We disagree.

A.     *Legal Principles*

Criminal defendants have a constitutional right to present a defense. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, §§ 3, 22; *Chambers v. Mississippi*, 410 U.S. 284, 294, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). This includes the right to, in the opening statement, refer to admissible evidence expected to be presented at trial. *See State v. Piche*, 71 Wn.2d 583, 585, 430 P.2d 522 (1967). However, "[t]his right is not absolute." *State v. Arredondo*, 188 Wn.2d 244, 265, 394 P.3d 348 (2017). It does not extend to irrelevant or inadmissible evidence. *State v. Wade*, 186 Wn. App. 749, 764, 346 P.3d 838 (2015). "Defendants have a right to present only relevant evidence." *State v. Jones*, 168 Wn.2d 713, 720, 230 P.3d 576 (2010). "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410, 108 S. Ct. 646, 98 L. Ed. 2d 798 (1988). The defendant's right to present a defense is subject to "established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302; *State v. Cayetano-Jaimes*, 190 Wn. App. 286, 296, 359 P.3d 919 (2015).

"Whether the exclusion of testimony violated the defendant's Sixth Amendment right to present a defense depends on whether the omitted evidence evaluated in the context of the entire record creates a reasonable doubt that did not otherwise exist." *State v. Duarte Vela*, 200 Wn. App. 306, 326, 402 P.3d 281 (2017), *review denied*, 190 Wn.2d 1005 (2018). To prevail on a claim that he was deprived of his Sixth Amendment right, the defendant must at least make some plausible showing of how the excluded evidence would have been both material and favorable to his defense. *State v. Gonzalez*, 110 Wn.2d 738, 750, 757 P.2d 925 (1988); *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 867, 102 S. Ct. 3440, 73 L. Ed. 2d 1193 (1982).

We review de novo whether the trial court violated a defendant's Sixth Amendment right. *State v. Arndt*, No. 95396-1, slip op. at 12 (Wash. December 5, 2019) http://www.courts.wa.gov/opinions/. However, we review a trial court's evidentiary rulings under an abuse of discretion. *Arndt*, No. 95396-1, slip op. at 12. Accordingly, we apply this two-step review process to review the trial court's evidentiary rulings for an abuse of discretion and to consider de novo the constitutional question of whether these rulings deprived Roque Gaspar of his Sixth Amendment right to present a defense. *Arndt*, No. 95396-1, slip op. at 12.

B.      *No Abuse of Discretion*

Roque Gaspar contends that the trial court erred by originally reserving ruling on the State's motion in limine because it prevented him from giving specific examples of A.G.'s behavior during his opening statement and by limiting his ability to cross-examine A.G. But the record does not support Roque Gaspar's contention.

A court has discretion to control the content of opening statements. *State v. Kroll*, 87 Wn.2d 829, 835, 558 P.2d 173 (1976). We review a court's exercise of that discretion for abuse.

*Kroll*, 87 Wn.2d at 835. While a defendant's right to present a defense extends to his opening statement, he has no constitutional right to refer to irrelevant and inadmissible evidence. *Jones*, 168 Wn.2d at 720; *Piche*, 71 Wn.2d at 585.

Prior to opening statements, the trial court attempted to clarify its ruling and advised Roque Gaspar to avoid the issue of promiscuity or text messages during his opening statement. On appeal, Roque Gaspar argues that he should have been permitted to reference that A.G. had been seen texting boys in order to fully present his defense theory. But Roque Gaspar fails to show that the evidence was relevant and admissible. Whether A.G. was texting boys had no bearing on Roque Gaspar's defense theory. Accordingly, we hold that the trial court's instruction to avoid the reference during opening arguments was not an abuse of discretion.

Additionally, the record does not show that the trial court limited Roque Gaspar's cross-examination of A.G. When the parties and the trial court revisited the motion in limine prior to Roque Gaspar's cross-examination of A.G., the trial court did not place any limitations on what Roque Gaspar indicated he would attempt to elicit. During cross-examination, Roque Gaspar asked A.G. about how her father's lecturing and questioning her about boys made her feel, and she responded that it did not upset her.

Similar discussions surrounding the motion in limine and potential witness testimony occurred outside the presence of the jury during the testimonies of Francisco and Aunt Rosa. In both instances, the trial court inquired as to what evidence Roque Gaspar expected to elicit. And

at no time did Roque Gaspar make an offer of proof for any relevant evidence that the trial court ruled inadmissible.[2]

We conclude that the trial court exercised appropriate discretion in navigating the motion in limine throughout trial. "We are mindful that '[t]he trial court has a gatekeeping function under the rules of evidence,'" which "necessarily entails making judgment calls as to what the jury may hear." *Arndt*, No. 95396-1, slip op. at 29 (alteration in original) (quoting *State v. Ellis*, 136 Wn.2d 498, 540, 963 P.2d 843 (1998)). Because the trial court's decisions were based on tenable grounds, it did not abuse its discretion.

C.      *Sixth Amendment Right To Present a Defense*

Because a defendant's constitutional right to present a defense is not absolute, the State's interest in excluding evidence must be balanced against the defendant's need for the information sought to be admitted. *Arndt*, No. 95396-1, slip op. at 29. In some instances, evidence is of such high probative value that no State interest can be compelling enough to preclude its introduction consistent with constitutional principles. *Arndt*, No. 95396-1, slip op. at 29.

---

[2] Roque Gaspar argues that the trial court erred by apply the rape shield statute to this case because the evidence at issue was of A.G.'s behavior *after* the incidents and therefore did not qualify as "past sexual behavior." Br. of Appellant at 2. The rape shield statute limits the ability of either party to introduce evidence of the past sexual behavior of a complaining witness. RCW 9A.44.020(2). The admissibility of evidence under the rape shield statute is within the discretion of the trial court. *State v. Aguirre*, 168 Wn.2d 350, 363, 229 P.3d 669 (2010). But because Roque Gaspar cannot point to any relevant evidence that was excluded from trial, we do not address this issue. However, we note that "[t]he purpose of the rape shield statute is to prevent prejudice arising from promiscuity and by suggesting a 'logical nexus between chastity and veracity.'" *State v. Sheets*, 128 Wn. App. 149, 155, 115 P.3d 1004 (2005) (quoting *State v. Peterson*, 35 Wn. App. 481, 485, 667 P.2d 645 (1983)). Given the policy purpose of the rape shield statute, it logically follows that the statute would extend to sexual behavior after the incident forming the basis of the charges.

Here, the trial court's rulings and comments did not preclude Roque Gaspar from presenting his defense theory. As Roque Gaspar acknowledges on appeal, he was able to introduce his defense theory in his opening statement, introduce evidence that A.G. was seen going into a house with a boy, introduce evidence that A.G. was seen kissing a boy, introduce evidence that A.G.'s father canceled her quinceanera because of her interactions with boys, and argue during closing argument that A.G. fabricated the rape allegations because she wanted to move away from her father's strict rules. Roque Gaspar fails to show how the trial court's evidentiary rulings meaningfully impacted his ability to present his defense theory. *Cf. Jones*, 168 Wn.2d at 721 (holding that the trial court prevented Jones from presenting a meaningful defense by excluding essential facts of high probative value whose exclusion effectively barred Jones from presenting his entire defense theory).

Accordingly, we hold that the trial court did not abuse its discretion by exercising its gatekeeping function and did not deprive Roque Gaspar of his Sixth Amendment right to present a defense.

## II. INTERROGATION VIDEO

Roque Gaspar also argues that the trial court erred by admitting the statements he made during his police interrogation. We disagree.

We review the trial court's decision after a CrR 3.5 hearing to determine whether substantial evidence supports the trial court's findings of fact and whether those findings support

the conclusions of law.[3]  *State v. Hughes*, 118 Wn. App. 713, 722, 77 P.3d 681 (2003).

"Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the

truth of the finding."  *State v. Solomon*, 114 Wn. App. 781, 789, 60 P.3d 1215 (2002) (quoting

*State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999)).  Further, we review the trial court's

conclusions of law de novo.  *Solomon*, 114 Wn. App. at 789.

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the

Washington Constitution protect a person from being compelled to give evidence against

himself.  *State v. Unga*, 165 Wn.2d 95, 100-01, 196 P.3d 645 (2008).  To be admissible, a

defendant's statements must be voluntary.  *Unga*, 165 Wn.2d at 100.  We consider the totality of

the circumstances to determine whether a defendant's statements were voluntary.  *Unga*, 165

Wn.2d at 100.  Generally, "'coercive police activity is a necessary predicate'" to finding that a

defendant's statements are not made voluntarily.  *Unga*, 165 Wn.2d at 101 (quoting *Colorado v.

Connelly*, 479 U.S. 157, 167, 107 S. Ct. 515, 93 L. Ed. 2d 473 (1986)).  We will not overturn the

trial court's determination that statements were voluntarily made if there is substantial evidence

in the record from which the trial court could find voluntariness by a preponderance of the

evidence.  *State v. Reuben*, 62 Wn. App. 620, 624, 814 P.2d 1177 (1991).

> Circumstances that are potentially relevant in the totality-of-the-circumstances analysis include the "crucial element of police coercion;" the length of the interrogation; its location; its continuity; the defendant's maturity, education, physical condition, and mental health; and whether the police advised the defendant

---

[3] The trial court's failure to reduce its CrR 3.5 findings and conclusions to writing is harmless if the trial court's oral findings in the record are sufficient to allow appellate review.  *State v. Thompson*, 73 Wn. App. 122, 130, 867 P.2d 691 (1994).  Here, the trial court rendered detailed oral findings of fact and conclusions of law.  Neither party disputes that these oral findings and conclusions are sufficient to facilitate this court's review.

of the rights to remain silent and to have counsel present during custodial interrogation.

*Unga*, 165 Wn.2d at 101 (quoting *Withrow v. Williams*, 507 U.S. 680, 693-94, 113 S. Ct. 1745, 123 L. Ed. 2d 407 (1993)). A detective's psychological ploys during interrogation may play a part in a suspect's decision to confess, "'but so long as that decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary.'" *Unga*, 165 Wn.2d at 102 (quoting *Miller v. Fenton*, 796 F.2d 598, 605 (3d Cir.1986)). The primary question is whether the interrogating detective's statements were so manipulative or coercive that they deprived the suspect of his ability to make an unconstrained, autonomous decision to confess. *Unga*, 165 Wn.2d at 102.

Here, Roque Gaspar contends that because he was held back a year in high school, afraid of authority, and interrogated in a police interview room he was more susceptible to the psychological coercion of the detective's questioning. He likens this case to *United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014). There, the Ninth Circuit held that the use of coercive interrogation methods on a suspect with "severe intellectual impairment" resulted in an involuntary confession. *Preston*, 751 F.3d at 1027-28. However, the facts of *Preston* are easily distinguished from the facts of this case.

Preston was 18 years old with an IQ of 65 at the time of his interrogation. *Preston*, 751 F.3d at 1020. His intellectual impairment was so clear to the investigating officers that they asked him if he was "disabled," but Preston had to ask for an explanation of the meaning of "disabled." *Preston*, 751 F.3d at 1020-21. A psychological evaluation of Preston revealed that Preston had

> a "very impaired" ability to understand "everyday interpersonal exchanges as well as . . . formal legal" exchanges. "[A]ny English verbal material must be repeated, reinforced, and then revisited." Without such repetition, "he may easily confuse the content of a conversation and give . . . spurious responses" or be misled. Thus, "[h]is relatively poor verbal linguistic fluency is likely to result in misunderstanding of directions or translate into delayed, unconventional, or inappropriate responses in verbal settings." Preston also finds "complexity . . . confusing" and has trouble understanding abstract terms. He has difficulty following "simultaneous communication," such as from two individuals speaking at once. Where there are two messages, Preston has trouble "sorting . . . out" what they are saying "and deciding how to respond." "[T]o set up the potential for him to understand something, you have to use rather simple, concrete terms."

*Preston*, 751 F.3d at 1021 (alterations in original). In contrast, Roque Gaspar testified at the CrR 3.5 hearing that he was "a pretty smart person," who had been held back during his sophomore year of high school due to not doing his homework. RP at 60. Roque Gaspar was gainfully employed and self-sufficient. The record supports the trial court's conclusion that Roque Gaspar's condition, maturity, physical condition, and mental health provided him the ability to knowingly, voluntarily, and intelligently waive his constitutional rights.

The record further supports the trial court's conclusion that the location, duration, and methods of the interrogation were not so manipulative or coercive that they deprived Roque Gaspar of his ability to make unconstrained, autonomous decisions. The interrogation lasted approximately one hour and forty minutes. As seen in the interrogation video, this included breaks and many long pauses between questions. The video shows that the detectives were not overbearing or loud. And although Detective Song warned Roque Gaspar that he would be in a "world of hurt" if he did not admit to having intercourse with A.G., considering the totality of the circumstances, the trial court did not err when it ruled that Detective Song's tactics were not so

14

manipulative or coercive that they deprived Roque Gaspar of his ability to make an autonomous decision to confess.

Accordingly, we hold that the trial court did not err by concluding that the statements made by Roque Gaspar during his interrogation were admissible and denying Roque Gaspar's motion to suppress.

We affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Worswick, P.J.

We concur:

Sutton, J.

Cruser, J.