# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 51905-4-II |
| Respondent, | |
| v. | |
| RUSHELLE RENEE STOKEN, | UNPUBLISHED OPINION |
| Appellant. | |

LEE, C.J. — Rushelle R. Stoken appeals her convictions and sentence for possession of a controlled substance (heroin) with intent to deliver and possession of a controlled substance (methamphetamine). Stoken contends the trial court erred in denying her CrR 3.6 motion to suppress, motion to reopen the CrR 3.6 hearing, and motion to reconsider the denial of her motion to reopen. Stoken also contends the trial court erred by denying her request for a prison-based drug offender sentencing alternative (DOSA) sentence and in imposing certain legal financial obligations (LFOs). We affirm Stoken's convictions and standard range sentence, but remand to the sentencing court to reconsider LFOs consistent with the 2018 legislative amendments and *Ramirez*.[1]

---

[1] *State v. Ramirez*, 191 Wn.2d 732, 747, 426 P.3d 714 (2018).

FACTS

On May 12, 2016, Aberdeen Police Department Detective Jason Perkinson arrived at a residence to investigate an identity theft and fraud case. From a bank's surveillance footage and photographs, Detective Perkinson knew that the suspect was a "skinny" woman with a "white complexion . . . wearing jackets." Verbatim Report of Proceedings (VRP) (July 14, 2017) at 7. One of the jackets was a pink. (CP 60) He also had footage of a vehicle associated with the subject that was "a late model . . . lighter or mid-color . . . sedan." VRP (July 14, 2017) at 7-8.

When he arrived at the residence, Detective Perkinson noticed a light-colored car parked on the side of the residence. The car resembled the car in the surveillance photographs.

Detective Perkinson knocked on the door and Melissa Atkinson opened the door. Perkinson was able to discern that Atkinson was not the woman from the photographs. Perkinson asked Atkinson about the vehicle parked on the side of the house and Atkinson told him she did not know there was a vehicle parked on the side of her house.

Detective Perkinson then went to the vehicle. He observed a woman inside, later identified as Stoken, who was sitting in the driver's seat and slumped over towards the passenger seat. He also noticed a jacket in the car with some pink fabric which he thought could have resembled the clothing worn by the identity theft suspect.

Detective Perkinson was concerned that Stoken was having a "medical condition . . . or even deceased." VRP (July 14, 2017) at 15. It was a warm, sunny day. He knocked on the window. Stoken woke up and opened the door. Perkinson noticed Stoken was sweating profusely and the detective could smell the "pungent odor that I associate with my training and experience to heroin." VRP (July 14, 2017) at 17. Perkinson asked Stoken to take off her jacket to "start

2

trying the cooling process." VRP (July 14, 2017) at 18. Perkinson thought that Stoken resembled the suspect he was looking for.

After establishing Stoken did not need medical attention, Detective Perkinson asked her for identification, which she provided. He told her he was investigating a false identity/fraud case. During this time, Stoken was fidgeting with her pockets even though the detective asked her not to.

Detective Perkinson observed a glass pipe sticking out of one of Stoken's pockets. Perkinson also observed a large object in the middle pocket of Stoken's sweatshirt that Stoken repeatedly reached for. Perkinson told her to stop reaching inside the sweatshirt at which point Stoken ran off. Perkinson was able to catch up to Stoken. Stoken threw a large object from inside the sweatshirt pocket right before the detective reached her. The object was a bundle containing multiple baggies of heroin, bags of other controlled substances, and several small baggies. There was "approximately one pound of pure heroin." Clerk's Papers (CP) at 137. Perkinson searched Stoken following her arrest and located the pipe he previously noticed coming out of her pocket with what appeared to be methamphetamine residue based on his training and experience.

The State charged Stoken with possession of a controlled substance (heroin) with intent to deliver and possession of a controlled substance (methamphetamine). [2]

Stoken moved to suppress the evidence based on an unlawful seizure pursuant to CrR 3.6. Detective Perkinson was the only witness who testified at the CrR 3.6 hearing, and he testified as

---

[2] The State also charged Stoken with two other counts of possession of a controlled substance, but those charges were dismissed.

outlined above. The State argued that the initial contact between Detective Perkinson and Stoken was for community caretaking and that after the detective looked at Stoken and smelled heroin then a brief investigative stop under *Terry*[3] was permitted. The trial court agreed and denied Stoken's motion to suppress. The trial court made the following oral findings of fact and conclusions of law:

> There's clearly an element of community caretaking. [Stoken] was in a locked vehicle on a warm, sunny day. She's wearing a vest on top of a sweatshirt and, basically, sleeping or passed out in her vehicle, and appeared more like a pass-out situation than sleeping. So that's a concern in regards of what the—in regards to anything else the officer was doing.
>
> With the vehicle and her description were generally similar to . . . the reasoning [Detective Perkinson] was at the property at the house. So if we are going to say that she was detained when he asked for her identification, which I think you can make a good argument, once that was done, there was some detention or slight detention there until she identified herself. The officer was standing by the door. It's not clear to me. I don't know if the testimony brought out whether she could have walked away without having the officer having to move. So I think at that point when he asked for identification, she was detained. But I think there's reasonable suspicion of a possible connection to his identity theft. The officer's identity theft investigation with a description of the car, the description of one of the people involved, and that person, [Atkinson], who was somehow identified with that. When that person was identified there at the house, as well as through this photo, that it wasn't the person. So it was clearly somebody else. And they were in—and then this vehicle is in close proximity to [Atkinson's] residence there. So those are facts that gave rise to a reasonable suspicion that [Stoken] may have been involved in that criminal activity. So it gave the officer the right to ask her to identify herself, which she did ultimately do and then shortly after bolted. So and then you add that running from the scene. And I think the officer's development of looking at what's in the vehicle, the drug paraphernalia in the vehicle; the jacket that's located inside the vehicle. That again is another item consistent with what the officer was investigating, along with her physical appearance, the clothing that she was wearing. So I think at that point there was probable cause to arrest when the officer did arrest her.

---

[3] *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

No. 51905-4-II

Therefore, whatever was taken from the arrest and as a result of the arrest in subsequent issuance of a warrant would be admissible. It's not—I'm not going to suppress it.

VRP (July 14, 2017) at 51-53. [4]

Later, Stoken moved to reopen the CrR 3.6 suppression hearing, informing the trial court that she suspected "the police have a color [photograph]" of the identity theft/fraud suspect. 1 VRP (Mar. 7, 2018) at 20. Stoken only had a black and white photograph. Stoken argued that a color photograph would demonstrate that the detective knew Stoken was not the identity theft/fraud suspect. The trial court denied the motion, concluding that it "doesn't matter" if the photograph was color or black and white because the "dispositive" issue is "probable cause" not "proof beyond a reasonable doubt." 1 VRP (Mar. 7, 2018) at 22.

After this hearing, Stoken obtained the color photograph of the suspect from the State. Arguing the woman in the photograph did not look like her, Stoken moved for the trial court to reconsider its denial to reopen the CrR 3.6 hearing. The trial court denied her motion.

The jury found Stoken guilty as charged. Stoken requested a prison-based DOSA sentence. The trial court ordered that Stoken be screened for a DOSA sentence.[5] The trial court ultimately denied Stoken's DOSA sentence request. The trial court stated, "I do not grant DOSAs to people

---

[4] The State informed the trial court it would prepare findings of fact and conclusions of law based on the trial court's oral ruling, but no written findings of fact and conclusions of law were entered. The failure to enter written findings of fact and conclusions of law following a suppression hearing is harmless error if the court's oral opinion and the record are "so clear and comprehensive that written findings would be a mere formality." *State v. Smith*, 68 Wn. App. 201, 208, 842 P.2d 494 (1992). Because neither party challenges the adequacy of the trial court's oral ruling, we review the trial court's oral findings of fact and conclusions of law.

[5] While the Department of Corrections provided the trial court with the information it considered in screening Stoken for a DOSA, our record does not contain DOC's actual recommendation.

5

who profit from the sale of heroin. I never have and I'm not going to start today. So the request for a prison-based DOSA is denied." VRP (May 11, 2018) at 23.

The trial court imposed a standard range sentence of 84 months on the possession of heroin with intent to deliver conviction, plus a 24-month sentence enhancement because the crime took place within 1,000 feet of a school bus route stop, and 12 months on the possession of methamphetamine conviction. The trial court also imposed the following LFOs: $100 deoxyribonucleic acid (DNA) collection fee, $1,625 court-appointed attorney fee, $200 criminal filing fee, $2000 violation of the Uniform Controlled Substances Act (VUCSA) fine, $300 drug task force fee, and $100 crime lab fee. The trial court entered an order of indigency for appeal purposes.

Stoken appeals.

## ANALYSIS

### A. CrR 3.6 Motion to Suppress

Stoken argues that the trial court erred in denying her CrR 3.6 motion to suppress because she was unlawfully seized. She contends that neither the community caretaking nor reasonable suspicion of criminal activity exceptions applied to her warrantless seizure. (Br. of Appellant at 11-17) We disagree.

#### 1. Standard of Review

Unchallenged findings of fact are verities on appeal. *State v. Luther*, 157 Wn.2d 63, 78, 134 P.3d 205, *cert denied*, 549 U.S. 978 (2006). Conclusions of law are reviewed de novo. *State v. Solomon*, 114 Wn. App. 781, 789, 60 P.3d 1215 (2002), *review denied*, 149 Wn.2d 1025 (2003).

2.      Legal Principles

Both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution prohibit warrantless searches and seizures unless an exception to the warrant requirement applies. *State v. Garvin*, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). The exclusionary rule requires suppression of all evidence obtained pursuant to a person's unlawful seizure. *State v. Winterstein*, 167 Wn.2d 620, 632, 220 P.3d 1226 (2009).

The community caretaking function is an exception to the warrant requirement. *State v. Kinzy*, 141 Wn.2d 373, 386, 5 P.3d 668 (2000), *cert. denied*, 531 U.S. 1104 (2001). Another exception is a *Terry* investigative stop. *State v. Fuentes*, 183 Wn.2d 149, 158, 352 P.3d 152 (2015).

3.      Community Caretaking Exception

The community caretaking exception to the warrant requirement allows for the limited invasion of constitutionally protected privacy rights when it is necessary for police officers to make a routine check on health and safety. *State v. Boisselle*, 194 Wn.2d 1, 10, 448 P.3d 19 (2019) (citations omitted). "When a warrantless search falls within an officer's general community caretaking function, such as the performance of a routine check on health and safety, courts must next determine whether the search was reasonable." *Id*. at 11-12 (citations omitted). Whether the encounter for a routine check on health and safety is reasonable "'depends upon a balancing of a citizen's privacy interest in freedom from police intrusion against the public's interest in having police perform a community caretaking function.'" *Id*. at 12 (internal quotation marks omitted) (quoting *Kinzy*, 141 Wn.2d at 394). "If the public's interest outweighs the citizen's privacy interest, the warrantless search was reasonable and was permissible under our state constitution." *Id.* (citations omitted).

"[I]n order for the community caretaking exception to apply, a court must first be satisfied that the officer's actions were 'totally divorced' from the detection and investigation of criminal activity." *Id.* at 11 (quoting *Kinzy*, 141 Wn.2d at 385). Accordingly, we must determine the threshold question of whether the community caretaking exception was used as a pretext for a criminal investigation before applying the community caretaking exception test.

Here, the trial court found that Stoken "was in a locked vehicle on a warm, sunny day. She's wearing a vest on top of a sweatshirt and, basically, sleeping or passed out in her vehicle, and appeared more like a pass-out situation than sleeping." VRP (July 14, 2017) at 51-52. Stoken argues any contact at this point would be unlawful because Detective Perkinson was at the residence to investigate a crime. But the undisputed evidence shows that the initial contact between Perkinson and Stoken was not to investigate a crime; rather, it was concern for Stoken's health and safety. Since checking on Stoken's health and safety was the basis for Perkinson's initial contact, the contact was not pretextual. Thus, the trial court properly concluded that the initial encounter between Perkinson and Stoken based on the community caretaking function was lawful. We now turn to whether the continued contact was lawful.

4. Reasonable Suspicion of Criminal Activity

Under *Terry*, an officer may "briefly detain a person for questioning, without a warrant, if the officer has reasonable suspicion that the person is or is about to be engaged in criminal activity." *State v. Weyand*, 188 Wn.2d 804, 811, 399 P.3d 530 (2017). "A valid *Terry* stop requires that the officer have reasonable suspicion of criminal activity based on specific and articulable facts known to the officer at the inception of the stop." *Fuentes*, 183 Wn.2d at 158. To evaluate the reasonableness of the officer's suspicion, this court looks at the totality of the circumstances

known to the officer. *Id.* "'The totality of circumstances includes the officer's training and experience, the location of the stop, the conduct of the person detained, the purpose of the stop, and the amount of physical intrusion on the suspect's liberty.'" *Weyand*, 188 Wn.2d at 811-12 (quoting *Fuentes*, 183 Wn.2d at 158). The officer's suspicion must be individualized to the person being stopped. *Fuentes*, 183 Wn.2d at 159.

Here, the trial court found that Detective Perkinson was involved in an identity theft/fraud investigation that led him to Atkinson's residence. "[T]he vehicle and [Stoken's] description were generally similar to . . . the reasoning he was at the property" VRP (July 14, 2017) at 52. The clothing that Stoken was wearing was also similar to the suspect. And since Perkinson noticed Atkinson did not match the photograph of the suspect, another female in the vicinity of the residence may have been "involved." VRP (July 14, 2017) at 52. These unchallenged findings of fact support the trial court's conclusion of law that Perkinson had "reasonable suspicion that [Stoken] may have been involved in criminal activity." VRP (July 14, 2017) at 52.

Detective Perkinson's continued encounter with Stoken, after checking on her health and safety, was a lawful *Terry* stop. During the *Terry* stop, Perkinson smelled the "pungent odor" that he "associate[d] with [his] training and experience to heroin." VRP (July 14, 2017) at 17. He observed a glass pipe sticking out of one of Stoken's pockets. Perkinson also observed a large object in the middle pocket of Stoken's sweatshirt that Stoken repeatedly reached for. Perkinson told Stoken to stop reaching inside the sweatshirt, at which point Stoken ran off. Perkinson was able to catch up to Stoken. Stoken threw a large object from inside the sweatshirt pocket right before the detective reached her. The object was a bundle containing multiple baggies of heroin, bags of other controlled substances, and several small baggies. Perkinson searched Stoken

9

following her arrest and located the pipe he previously noticed coming out of her pocket with what appeared to be methamphetamine residue based on his training and experience. Thus, Perkinson had probable cause to arrest, and the search was a lawful search incident to arrest. We hold that the trial court properly denied Stoken's CrR 3.6 motion to suppress.

B.      MOTION TO REOPEN CRR 3.6 HEARING/MOTION FOR RECONSIDERATION

Stoken next contends that the trial court erred in denying her motion to reopen the CrR 3.6 suppression hearing and her motion for reconsideration of the denial of her motion to reopen. We disagree.

1.      Motion to Reopen

A motion to reopen a proceeding for the purpose of introducing additional evidence is addressed to the sound discretion of the trial court. *State v. Tyler*, 177 Wn.2d 690, 697, 302 P.3d 165 (2013). An abuse of discretion exists when a trial court's exercise of its discretion is based upon untenable grounds or reasons. *State v. Quaale*, 182 Wn.2d 191, 197, 340 P.3d 213 (2014).

Here, Stoken moved to reopen the CrR 3.6 suppression hearing because she suspected "the police [had] a color [photograph]" of the identity theft/fraud suspect and a color photograph would demonstrate that the detective knew Stoken was not the identity theft/fraud suspect. 1 VRP (Mar. 7, 2018) at 20. But, as the trial court correctly pointed out, the *Terry* stop did not need "proof beyond a reasonable doubt." 1 VRP (Mar. 7, 2018) at 22. As discussed above, the vehicle's location next to a residence connected to the identity theft/fraud investigation, Stoken's general resemblance to the suspect, her clothing, and the fact another female at the residence had already been ruled out as being a suspect provided a reasonable suspicion of criminal activity for a *Terry* stop. A color photograph instead of a black and white photograph would not negate this reasonable

10

suspicion. Accordingly, the trial court did not abuse its discretion in denying Stoken's motion to reopen the case in order to admit into evidence a color photograph of the identity theft/fraud suspect.

>       2.      Motion for Reconsideration

Like a motion to reopen, a motion for reconsideration is left to the sound discretion of the trial court. *Tyler*, 177 Wn.2d at 697. For the same reasons we concluded that the trial court did not abuse its discretion in denying Stoken's motion to reopen the suppression hearing, we also conclude the trial court did not abuse its discretion in denying her motion for reconsideration. Here, a color photograph did not negate reasonable suspicion for a valid *Terry* stop.

## C.      DOSA

Stoken next contends that the trial court abused its discretion by not exercising its discretion when deciding whether to impose a DOSA sentence. We disagree.

In general, decisions regarding DOSA sentences rest within the trial court's discretion. *State v. Yancey*, 193 Wn.2d 26, 34, 434 P.3d 518 (2019). Ordinarily, a trial court's decision to not impose a DOSA sentence is not reviewable on appeal. *State v. Bramme,* 115 Wn. App. 844, 850, 64 P.3d 60 (2003). Exceptions include refusing to exercise discretion at all or relying on an impermissible basis in making the decision. *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997), *review denied*, 136 Wn.2d 1002 (1998). "While no defendant is entitled to an exceptional sentence below the standard range–every defendant is entitled to ask the trial court to consider such a sentence and to have the alternative actually considered." *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005). A trial court's failure to meaningfully consider a sentencing alternative is reversible error. *Id.*

In *Grayson*, the trial court's stated reason for denying a DOSA request was because it thought the program was underfunded. *Id.* Our Supreme Court held that a court's "categorical refusal to consider [a DOSA] sentence, or the refusal to consider it for a class of offenders, is effectively a failure to exercise discretion and is subject to reversal." *Id.* The Supreme Court held that the trial court did not meaningfully consider a DOSA sentence because the trial court did not think it was a meaningful option. *Id.* The Supreme Court remanded for the trial court to consider whether Grayson was an appropriate candidate for a DOSA. *Id.* at 343.

Here, the trial court did not deny Stoken's DOSA sentence request because it did not think a DOSA was an option; rather, the trial court considered the option but based on the jury's finding that Stoken was guilty of possession of almost a pound of heroin with intent to deliver, the trial court relied on an adjudicative fact[6] to not order a DOSA sentence. Unlike in *Grayson*, the trial court here did consider Stoken's request for a DOSA sentence and, after looking at the facts of her case, concluded a DOSA sentence was not appropriate. In doing so, it did not abuse its discretion.

D.    LFOs

Stoken lastly contends that certain LFOs should be stricken. (Br. of Appellant at 25-26) The State concedes that the imposed LFOs may not "conform with the current state of the law." Br. of Respondent at 13. We accept the State's concession and remand to the sentencing court to reconsider LFOs in light of the 2018 legislative amendments and *Ramirez*.[7]

---

[6] "[A]djudicative facts are those developed in a particular case" as compared to a legislative fact that is a truth that does not change from case to case. *Grayson*, 154 Wn.2d at 340.

[7] *Ramirez*, 191 Wn.2d at 747.

No. 51905-4-II

We affirm Stoken's convictions and standard range sentence, but remand to the sentencing court to reconsider LFOs.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, C.J.

We concur:

Worswick, J.

Melnick. J.